864 A.2d 387

BRUNSWICK HILLS RACQUET CLUB, INC., PLAINTIFF–APPEL-
LANT, v. ROUTE 18 SHOPPING CENTER ASSOCIATES, A LIM-
ITED PARTNERSHIP, DEFENDANT–RESPONDENT.

Argued October 28, 2004—Decided January 25, 2005.

212

*David C. Apy* argued the cause for appellant (*McCarter & English,* attorneys; *Mr. Apy* and *Joseph R. Scholz,* on the briefs).

*Sheppard A. Guryan* argued the cause for respondent (*Lasser Hochman,* attorneys; *Bruce H. Snyder,* on the brief).

*Edwin J. McCreedy,* President, submitted a brief on behalf of *amicus curiae,* New Jersey State Bar Association.

Justice ALBIN delivered the opinion of the Court.

In the highly competitive world of commercial transactions, sophisticated business entities operate according to the impersonal laws of the marketplace in which self-interest, not altruism, is the dominating principle. We must decide to what extent the covenant of good faith and fair dealing, which is implicit in every contract, governs the arms-length business transactions of such entities.

In this case, a commercial tenant was obliged to exercise an option for a long-term lease by both giving notice and tendering a fixed sum of money to the landlord by a specified date. The tenant timely notified the landlord of its intent to exercise the option nineteen months in advance of the contractual deadline. The tenant, however, failed to make the up-front payment necessary to perfect the option, believing that the payment was required only at the time of closing of the new lease. Over the next nineteen months, the tenant, through its attorneys, repeatedly wrote and spoke with agents of the landlord for the purpose of setting the date and terms of the closing. The landlord's agents, through a series of written and verbal evasions, delayed responding to the persistent requests of the tenant to close the deal. The landlord never requested the option payment money or advised the tenant that it had not fulfilled an essential term of the contract. When the deadline for exercising the option passed, the landlord, for the first time, pointed out the deficiency to the tenant. The landlord told the tenant that the option was "null and void."

The tenant unsuccessfully brought suit to enforce the option. The Appellate Division affirmed the trial court's denial of relief to the tenant, stating that the tenant had no legal recourse in light of its failure to abide by the strict terms for executing the option. The panel found that the covenant of good faith and fair dealing was not violated by the landlord's artful dodging and studied silence. We disagree and now reverse.

## I.

## A.

Plaintiff Brunswick Hills Racquet Club, Inc. owns and operates a tennis club in East Brunswick on property that it leases from defendant Route 18 Shopping Center Associates. In December 1976, the original landlords, Route 18 Shopping Center, Inc. and Old Bridge Annex, Inc., entered into a written lease agreement with the original tenants, Joseph Grossman, Joseph Manzo, Alfred Horowitz, and Allen Glenn. The original landlords later conveyed their interests in the shopping center to defendant, and the original tenants later conveyed their interests in the lease to plaintiff.[1]

The agreement provided for an initial twenty-five-year term and permitted plaintiff to construct and operate an indoor tennis center on the leased premises. In accordance with the terms of the contract, plaintiff built a tennis facility, investing approximately one million dollars in capital improvements. The lease provided for an automatic twenty-five-year extension, unless plaintiff "communicated not less than six (6) months prior written notice to [defendant] of its intention to terminate this Lease...."

The agreement also provided plaintiff with the option of purchasing the leased property or entering into a ninety-nine-year lease, both on very favorable financial terms.[2] In order to exercise the option either to purchase the property or to lease the

---

[1] Plaintiff Brunswick Hills Racquet Club, Inc. is owned by Grossman, Manzo, and Thomas Cuming.

[2] The terms for exercising the option are set forth in paragraph 42 of the contract.

 42. *OPTION TO PURCHASE DEMISED PREMISES*

 42.1 In lieu of the right to extend the original term of this Lease as provided in Article 41 above, *Tenant shall have the right, exercisable by written notice to Landlord communicated not later than six (6) months prior to the expiration of the original term hereof, to purchase the Demised Premises or otherwise convert this Lease into a fully vested ninety-nine (99) year land lease, upon and subject to the following express conditions:*

property over a ninety-nine-year term, the contract required plaintiff both to notify defendant of its intention and to pay $150,000 no later than September 30, 2001, six months before the expiration of the original lease term. Otherwise, the option would be lost. Additionally, if plaintiff did not exercise the option or terminate the lease by that date, the rent would increase to more than triple what plaintiff had been paying during the original lease term. During the period leading up to the option deadline, plaintiff repeatedly expressed in writing its intent to exercise the option. The heart of the controversy concerns defendant's nineteen-month posture of silence, which was punctuated by written and verbal evasions and delay, and plaintiff's failure to pay the option price of $150,000 to defendant before the deadline.

## B.

We now review the series of letters that have led to this litigation. On February 23, 2000—nineteen months before the

---

A. That with respect to a purchase of the Demised Premises, Tenant shall have theretofore obtained at its cost and expense a final, irrevocable and unappealable approval from the applicable municipal authority to subdivide the Demised Premises from the remaining property of Landlord;

B. That with respect to the fully vested ninety-nine (99) year land lease, the continuing interest of Tenant in and to the Demised Premises, shall at all times remain subject to the terms of this Lease;

C. That with respect to either purchase or lease of the Demised Premises, *Tenant shall pay to Landlord, upon the exercise of its right hereunder, a purchase price or rental (fully paid in advance) of an amount equal to the product of the minimum annual rental then being paid by Tenant times twelve (12).*

D. That with respect to the fully vested 99 year lease the Purchaser shall at any time after the commencement of said 99 year lease have the right to purchase the underlying fee from the landlord for the sum of $1.00 after the obtaining of a sub-division as set forth in Paragraph A. herein.

42.2 *Should Tenant fail to exercise the right herein granted at the time and in the manner herein provided, or should Tenant fail to comply with the conditions herein set forth,* this Article 42 and the right herein granted to Tenant *shall automatically become null and void* and of no further force and effect *on the date corresponding to the 180th day prior to the expiration of the original Lease term.*

[ (Emphasis added).]

option deadline—plaintiff's attorney, Gabriel E. Spector, wrote to Rosen Associates Management Corporation, defendant's property management company, informing it that plaintiff intended to exercise its option to purchase the ninety-nine-year lease. That letter, in pertinent part, read:

> On behalf of my clients, this letter is written to exercise the option to purchase the ninety-nine year lease effective March 31, 2002. In accordance with the lease, the purchase price will be $150,000.00 representing the base annual rent of $12,500 times twelve.
>
> Prior to the closing on the lease, we will obtain a title search to verify the status of title and supply you or your attorney with a copy of same. Further, pursuant to Paragraph 42 of the original lease, the ninety-nine year lease will be subject to the terms and conditions of the original lease.
>
> Please advise whether your attorney or you will be preparing the ninety-nine year lease. I would like to receive it well in advance of the closing date in order to review same. If you know who will be representing you in this matter, please advise.

Plaintiff did not tender the required payment of $150,000 with that letter or at any time before the option deadline.

On March 8, 2000, Florence Rosen of Rosen Associates responded to Spector, stating that she had forwarded his letter to "our" attorney and would "be in touch with [Spector] within a week or two." One month later, on April 3, 2000, Spector wrote again to Rosen: "[Y]ou wrote to me on March 8 and advised that I would hear from you in a week or two. I have heard nothing and I would appreciate receiving a response." Two months later, on June 9, 2000, Spector wrote yet again to Rosen, enclosing his previous letters: "I have not heard from you. . . . I would appreciate hearing from either you or your attorney concerning the matter."

On June 19, 2000, defendant's attorney wrote to Spector, advising him that he represented Rosen Associates and that Spector's June 9 letter had been referred to him for reply.[3] The lawyer invited Spector to call him "at [Spector's] convenience." One

---

[3] We note that the same attorney represented both defendant and defendant's property management company, Rosen Associates. For the sake of convenience, he is referred to as defendant's attorney throughout this opinion.

month later, Spector forwarded a letter to the attorney reminding him about their telephone conversation two weeks earlier, in which he told Spector that he "would review the file and get back to [Spector]." Spector concluded by stating that he "would appreciate hearing from [him] as soon as possible."

When several weeks passed without a reply, Spector wrote once more to defendant's attorney stating that he had yet to hear from him. In an effort to move forward with the closing on the ninety-nine-year lease, Spector requested that the lawyer provide information concerning common area billing charges and real estate taxes for the previous year. Spector closed by writing, "I would like to resolve this matter as soon as possible and I would appreciate hearing from you." Five days later, defendant's attorney tersely replied: "I acknowledge receipt of your letter dated August 3, 2000 and have forwarded same to my client for its review."

Four-and-one-half months later, on December 28, 2000, Thomas Cuming, one of plaintiff's corporate officers, received a letter from defendant's property management company demanding that plaintiff complete an estoppel certificate in support of defendant's application for a bank loan. Cuming signed and returned the estoppel certificate for plaintiff, making two substantive changes. First, Cuming crossed out a portion of one paragraph that read: "Tenant has no right of first refusal or option to purchase the Premises." In its place, he inserted: "Tenant has exercised its option to convert the lease to a fully prepaid 99 year lease effective March 31st 2002." Second, Cuming added the following statement to another paragraph of the certificate: "Tenant has given notice of its exercise of the option to convert lease to a 99 year prepaid lease." Defendant neither responded to nor commented on Cuming's changes.

On January 16, 2001, Spector wrote yet again to defendant's attorney, noting that he had not received the information sought in his August 2000 letter. As he had in prior letters, Spector requested the opportunity "to receive and review the ninety-nine

year lease as soon as possible." The lawyer never replied to Spector's letter. After a long illness, Spector died on May 28, 2001.

Seven months after Spector's final letter, and with little more than a month remaining before the option deadline of September 30, 2001, Spector's law partner, Arnold B. Levin, forwarded a letter to Rosen Associates via certified mail:

> You will recall the letter from my late partner, Gabriel E. Spector, Esq., to you of February 23, 2000 (copy attached). In Mr. Spector's letter, he had told you that our client, Brunswick Hills Racquet Club, Inc., was exercising the option contained in the Lease to purchase the 99 year Lease effective March 31, 2002.
>
> Mr. Spector's letter had requested a response as to whether you or your attorney would be preparing the 99 year Lease and requested that it be submitted well in advance of the closing so that it could be reviewed in the proper manner.

Levin then set forth the history of Spector's correspondence and contacts with Rosen Associates and defendant's attorney, and concluded by stating:

> The purpose of this letter is to serve as a courtesy advice that I am now handling this matter in behalf of our client and that we would like to have a copy of the proposed Lease forwarded to us as quickly as possible so that we can address any issues that may require attention. As a courtesy to you and [your attorney], I have sent [him] a copy of this letter as well. It would be appreciated if you or [your attorney] would respond to our office upon your receipt of this letter.

There was no response to Levin's letter, and the option deadline passed.

Four months later, on December 17, 2001, still looking to finalize the option terms with a willing agent acting on defendant's behalf, Levin wrote again to Rosen Associates. Levin enclosed a copy of Spector's almost two-year-old original letter "exercising the option to purchase the 99 year lease effective March 31, 2002. . . ." Levin requested "a copy of the proposed lease for review and approval so that [they could] be prepared to proceed with the execution of the lease." A copy of the letter was sent to defendant's attorney.

On January 14, 2002, Levin finally received a telephone response from the attorney, and the two discussed details concerning plaintiff's expected purchase of the ninety-nine-year lease.

During their conversation, the attorney questioned the need to draft a new lease. In a letter forwarded to him the next day, Levin memorialized their discussions and made further proposals about preparing and recording the ninety-nine-year lease.

On February 5, 2002, two years after Spector first communicated plaintiff's intent to exercise the option, defendant's attorney dropped the hammer. In a letter to Levin, the lawyer, for the first time, took the position that plaintiff had not properly executed the option and that defendant would not honor plaintiff's attempt to do so:

> As you are aware, this office represents Route 18 Shopping Center Associates, the current Landlord in connection with the ... Lease Agreement [between Route 18 Shopping Center, Inc. and Brunswick Hills Racquet Club]. Your office's correspondence, on behalf of the current Tenant, Brunswick Hills Racquet Club, Inc., purporting to exercise the Tenant's right to convert the Lease into a fully-vested ninety-nine (99) year Land Lease, pursuant to paragraph 42, has been referred to us for reply.
>
> ....
>
> The original term hereof expires March 31, 2002. Accordingly, under the plain terms of the Lease, conversion of the Lease into a fully vested 99–year Land Lease would have required that the Tenant provide written notice of the exercise of the option to convert the Lease into a 99–year Land Lease *and* pay to Landlord an amount equal to the product of the minimum annual rental then being paid by Tenant times 12 no later than September 30, 2001. Inasmuch as the payment was not made within the time frame required, any rights granted pursuant to Article 42 automatically became null and void and of no further force and effect as of that date.
>
> Accordingly, any attempt to exercise any of the rights of the Tenant pursuant to Article 42 is hereby rejected. Please be guided accordingly.

Two days later, a clearly vexed Arnold Levin responded:

> I was shocked by your letter of February 5, 2002.
>
> You are fully aware of the communications that began with those from my late partner in February 2000 making it clear that our client exercised the option to acquire the 99 year lease. A number of further written and oral communications were made to your client and to you, the most recent having been my conversation with you on January 14, 2002 and my responding letter of January 15, 2002.
>
> The telephone conversation of January 14, 2002 responded to my letter of December 17, 2001. In your call, your only question was the need for a 99 year lease since the terms of the lease were detailed in the original lease. You did not state that there had been a failure to exercise the option, which failure you are now saying occurred on September 30, 2001.

. . . .

I concluded our conversation on February 6, 2002 advising that litigation will follow. I anticipate that the litigation will proceed quickly and that all remedies will be sought.

Soon thereafter, defendant rejected plaintiff's tender of the $150,000 option price. Plaintiff then deposited that amount in escrow and filed suit in the Law Division to compel specific performance of the option and to obtain damages on a common law claim alleged in the complaint.[4]

## C.

At the conclusion of a bench trial that included the testimony of dueling experts and Arnold Levin, the trial court determined that the credible evidence did not support plaintiff's claims and entered judgment in favor of defendant. The court found that the contract clearly required plaintiff to exercise the option and pay the $150,000 in a timely manner. According to the court, a written notice exercising the lease option without tendering payment before the deadline did not satisfy the terms of the contract. The court ruled that defendant had no duty to inform plaintiff that it had not properly exercised the option and that defendant had not misrepresented any fact causing plaintiff harm.

The court also ruled that the contract provision permitting plaintiff to cure a default applied only to late rental payments and not to an exercise of the option. Inasmuch as plaintiff had no duty to exercise the option, the court reasoned that there could be no default, and without a default there was no opportunity to cure. In its view, sophisticated and experienced business entities are capable of protecting themselves, and, therefore, the court declined to interfere in this commercial real estate transaction.

---

[4] Plaintiff did not press its claim against defendant for tortious interference with plaintiff's contractual rights before either the Appellate Division or this Court.

The Appellate Division, in a *per curiam* opinion, affirmed the trial court's decision, holding that plaintiff failed to act in "strict accordance" with the contract terms governing the option. Because plaintiff did not tender payment until after the option deadline, the panel determined that the "attempt to exercise the option was nugatory." The lease terms, the panel ruled, provided plaintiff with no right to cure its mistake. The panel agreed with the trial court that defendant had no "affirmative duty" to disclose to plaintiff that it had fumbled in exercising the option. As such, it found that defendant did not breach a duty of candor or the covenant of good faith and fair dealing inherent in every contract. Finally, in noting that the parties were sophisticated business entities represented by counsel, the panel declined to write a more favorable contract for plaintiff than the one it had signed.

We granted plaintiff's petition for certification. *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.,* 180 *N.J.* 150, 849 *A.*2d 183 (2004). We also granted the New Jersey State Bar Association's motion to participate as *amicus curiae.*

## II.

### A.

First, we address whether plaintiff properly exercised the option. On that issue, we stand in agreement with the conclusions of both the trial court and Appellate Division that the terms of the lease agreement are clear. The contract provided that plaintiff "shall pay to Landlord, upon the exercise of its right [to exercise the option to purchase the 99–year lease], a purchase price or rental (fully paid in advance) of an amount equal to the product of the minimum annual rental then being paid by Tenant times twelve (12)." Plaintiff was required to exercise the option no later than September 30, 2001, "the 180th day prior to the expiration of the original Lease term." Plaintiff's failure "to exercise the right ... at the time and in the manner ... provided" rendered that

right "null and void." Plaintiff did not make the requisite payment before the option deadline in accordance with the contract.

Having concluded that plaintiff did not exercise the option properly does not end the matter. We also must determine whether defendant violated the covenant of good faith and fair dealing implicit in every contract. Our analysis must begin with an understanding of the general principles that apply to option provisions in contracts.

In a real estate transaction, an option contract is a unilateral agreement requiring a party to convey property at a specified price, provided the option holder exercises the option "in strict accordance" with the terms and time requirements of the contract. *State By and Through Adams v. New Jersey Zinc Co.*, 40 *N.J.* 560, 576, 193 *A.*2d 244 (1963) (citing *Schlein v. Gairoard*, 127 *N.J.L.* 358, 359–60, 22 *A.*2d 539 (E. & A.1941)); *see also Brick Plaza, Inc. v. Humble Oil & Refining Co.*, 218 *N.J.Super.* 101, 104, 526 *A.*2d 1139 (App.Div.1987) (observing that "[t]he general rule is that in an option contract, time is of the essence"). Within the terms and time limitations of the option contract, the property owner is bound by an irrevocable offer to sell the property, while the option holder is under no obligation to act. *Adams, supra*, 40 *N.J.* at 576, 193 *A.*2d 244. Because the property owner cannot withdraw the offer, we require the option holder, who is "free to accept or reject," to adhere strictly to the terms of the contract. *Goodyear Tire and Rubber Co. v. Kin Props., Inc.*, 276 *N.J.Super.* 96, 105, 647 *A.*2d 478 (App.Div.) (internal quotations omitted), *certif. denied*, 139 *N.J.* 290, 654 *A.*2d 470 (1994).

As discussed, plaintiff did not abide by the strict terms governing the exercise of the option and, ordinarily, would suffer the consequences of its default. Courts generally should not tinker with a finely drawn and precise contract entered into by experienced business people that regulates their financial affairs. Equitable relief is not available merely because enforcement of the contract causes hardship to one of the parties. *Dunkin' Donuts of America, Inc. v. Middletown Donut Corp.*, 100 *N.J.* 166, 183–84,

495 *A.*2d 66 (1985). A court cannot "abrogate the terms of a contract" unless there is a settled equitable principle, such as fraud, mistake, or accident, allowing for such intervention. *Id.* at 183, 495 *A.*2d 66. Plaintiff claims that this is a case for equitable intervention because defendant breached its duty to act in good faith and to deal fairly with plaintiff in fulfilling the terms of the contract.

## B.

Every party to a contract, including one with an option provision, is bound by a duty of good faith and fair dealing in both the performance and enforcement of the contract. *See Wilson v. Amerada Hess Corp.*, 168 *N.J.* 236, 241, 244, 773 *A.*2d 1121 (2001) (holding that "[a] covenant of good faith and fair dealing is implied in every contract," including contract granting party unilateral discretion over pricing); *see also Sons of Thunder, Inc. v. Borden, Inc.*, 148 *N.J.* 396, 420–21, 690 *A.*2d 575 (1997) (holding same for contract granting party unilateral right of termination); *Restatement (Second) of Contracts* § 205 (1981) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."); 23 *Williston on Contracts* § 63:22, at 506 (Lord ed.2002) (same).

Good faith is a concept that defies precise definition. The Uniform Commercial Code, as codified in New Jersey, defines good faith as "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." *N.J.S.A.* 12A:2–103(1)(b). Good faith conduct is conduct that does not " 'violate community standards of decency, fairness or reasonableness.' " *Wilson, supra,* 168 *N.J.* at 245, 773 *A.*2d 1121 (quoting *Restatement (Second) of Contracts, supra,* § 205 comment a). " 'Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.' " *Ibid.* (quoting *Restatement (Second) of Contracts, supra,* § 205 comment a). The covenant of good faith and fair dealing calls for parties to a

contract to refrain from doing "anything which will have the effect of destroying or injuring the right of the other party to receive" the benefits of the contract. *Palisades Props., Inc. v. Brunetti*, 44 *N.J.* 117, 130, 207 *A.*2d 522 (1965) (internal quotations omitted); *see also Wade v. Kessler Institute*, 172 *N.J.* 327, 340, 798 *A.*2d 1251 (2002) (same).

Proof of "bad motive or intention" is vital to an action for breach of the covenant. *Wilson, supra*, 168 *N.J.* at 251, 773 *A.*2d 1121. The party claiming a breach of the covenant of good faith and fair dealing "must provide evidence sufficient to support a conclusion that the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties." *Williston, supra*, § 63:22, at 513–14 (footnotes omitted); *see also Wilson, supra*, 168 *N.J.* at 251, 773 *A.*2d 1121; *Sons of Thunder, supra*, 148 *N.J.* at 420, 690 *A.*2d 575. As a general rule, "[s]ubterfuges and evasions" in the performance of a contract violate the covenant of good faith and fair dealing "even though the actor believes his conduct to be justified." *Restatement (Second) of Contracts, supra*, § 205 comment d.

## C.

We cannot catalogue the myriad forms of conduct that may constitute a violation of the covenant of good faith and fair dealing. Each case is fact-sensitive. This Court, however, has addressed the covenant in a number of different settings. *See, e.g., Wilson, supra*, 168 *N.J.* at 241, 244, 773 *A.*2d 1121 (applying covenant to contract granting defendant unilateral authority to set and change prices); *Sons of Thunder, supra*, 148 *N.J.* at 398, 425, 690 *A.*2d 575 (applying covenant in case involving defendant's termination of contract that denied plaintiff its "reasonable expectations and right to receive the fruits of the contract"); *Bak–A–Lum Corp. v. Alcoa Building Prods.*, 69 *N.J.* 123, 126–27, 129–30, 351 *A.*2d 349 (1976) (applying covenant to termination of at-will exclusive distributorship in which defendant intentionally misled

and caused harm to plaintiff). Although those cases rest on facts different from those presented here, they yield a few salient principles relevant to our analysis. A defendant may be liable for a breach of the covenant of good faith and fair dealing even if it does not "violat[e] an express term of a contract." *Sons of Thunder, supra,* 148 *N.J.* at 423, 690 *A.*2d 575. A plaintiff may be entitled to relief under the covenant if its reasonable expectations are destroyed when a defendant acts with ill motives and without any legitimate purpose. *Wilson, supra,* 168 *N.J.* at 251, 773 *A.*2d 1121. Moreover, a plaintiff may get relief if it relies to its detriment on a defendant's intentional misleading assertions. *Bak–A–Lum, supra,* 69 *N.J.* at 129–30, 351 *A.*2d 349.

*Bak–A–Lum, supra,* provides a useful comparison to the case before us. In that case involving a franchise distributorship, the defendant had granted to the plaintiff the exclusive rights to distribute aluminum siding within a region. *Bak–A–Lum, supra,* 69 *N.J.* at 126, 351 *A.*2d 349. The defendant decided to terminate the plaintiff's exclusive distributorship and to add new distributors to the plaintiff's territory. *Id.* at 127, 351 *A.*2d 349. Defendant withheld that critical information while plaintiff "undertook a major expansion of its warehouse facilities at substantial added operating expense" and signed a five-year lease for the additional space. *Ibid.* According to the plaintiff, the defendant not only was aware of that expansion, but encouraged it. *Ibid.* The plaintiff sued for breach of contract. *Ibid.*

The trial court found that the defendant deliberately hid its intentions from the plaintiff to " 'avoid any risk of cooling [the] plaintiff's interest in selling [the defendant's] products during the several months before the new distributors were named and made ready to go.' " *Id.* at 128, 351 *A.*2d 349 (quoting trial court). The trial court also found that "the disruption of the contractual arrangement" reflected " 'a certain hypocrisy as well as ruthless-ness on the part of [the defendant] toward its distributor of many years.' " *Ibid.* (quoting trial court). We found that there was no "literal" breach of the agreement's express terms. *Id.* at 130, 351

A.2d 349. We nevertheless concluded that the "defendant's selfish withholding from [the] plaintiff of its intention" to terminate the plaintiff's exclusive distributorship, while knowing that the plaintiff continued to make financial investments to build on that distributorship, violated the covenant of good faith and fair dealing. *Ibid.*

Like *Bak–A–Lum, supra,* we are faced with a defendant whose actions do not literally violate any express term of the contract. Yet, as in *Bak–A–Lum, supra,* defendant here withheld vital information from plaintiff with the purpose of exploiting the terms of the contract without regard to the harm caused to plaintiff. As in *Bak–A–Lum, supra,* plaintiff here relied on the presumed good faith of defendant to its detriment.

*Goodyear, supra,* is also instructive, although it did not concern a breach of the covenant of good faith and fair dealing. 276 *N.J.Super.* at 97–98, 647 *A.*2d 478. In that case, under the terms of a lease, a commercial tenant was required to notify the landlord of its intent to exercise a renewal option during a specific three-month period. *Id.* at 98, 647 *A.*2d 478. The tenant's employee provided written notice to the landlord approximately one year in advance of, but never within, that three-month window. *Ibid.* When the option period elapsed, the landlord pointed the mistake out to the tenant and asked the tenant to vacate the leased premises. *Id.* at 99, 647 *A.*2d 478. The tenant sought a declaratory judgment that its exercise of the option was effective, claiming that its loss of the leasehold for an "inadvertent" and harmless mistake would impose an unfair and substantial financial hardship. *Ibid.*

Although the tenant failed to comply with the strict terms of the option provision, the trial court granted the declaratory judgment in favor of the tenant, and the Appellate Division affirmed. *Id.* at 106, 647 *A.*2d 478. The Appellate Division observed that "[t]here is a vast difference between a substantially late exercise of an option to renew a lease, in which case the option expires and is lost, and the early exercise of an option which merely permits the parties to solidify the terms of the extension period at an earlier

time." *Id.* at 101–02, 647 *A.*2d 478. According to the panel, "to impose a hardship on plaintiff for the mistake of one employee which caused no disadvantage to the defendants would be inequitable." *Id.* at 105, 647 *A.*2d 478.

On the other hand, the present case stands in sharp contrast to *Brick Plaza, supra,* 218 *N.J.Super.* at 101, 526 *A.*2d 1139. In that case, the tenant had an option to purchase premises according to the terms of its long-term lease, but failed to give notice of its intent until five months after the deadline had passed. *Id.* at 103, 526 *A.*2d 1139. The tenant had invested a substantial amount of money in capital improvements to the premises and argued that denial of the option would cause a financial hardship. *Ibid.* The tenant claimed that its oversight in exercising its option was an " 'honest mistake' " arising from its reliance on an incorrect draft of the lease agreement. *Ibid.* The Appellate Division observed that "[t]he maxim has long been recognized that equity aids the vigilant, not those who sleep on their rights" and refused to grant the tenant relief. *Id.* at 104, 526 *A.*2d 1139. The panel found that the tenant's reliance on an incorrect prior draft while its attorney had the correct draft amounted to " 'positive neglect.' " *Id.* at 105, 526 *A.*2d 1139 (quoting *Moro v. Pulone,* 140 *N.J. Eq.* 25, 30, 52 *A.*2d 818 (Ch.1947)).

In comparing *Brick Plaza, supra,* to the present case, we note that in both cases, the tenants failed to exercise the option in accordance with the lease terms. In both cases, the tenants made capital improvements to the premises and faced financial hardship if not permitted to exercise the lease option. However, unlike the tenant in *Brick Plaza, supra,* plaintiff here did not sleep on its rights and gave notice of its intent to renew nineteen months *in advance* of the option deadline. Unlike the landlord in *Brick Plaza, supra,* defendant here knew of plaintiff's intent to exercise the option and yet engaged in subterfuge and foot-dragging, thus delaying plaintiff's efforts to close timely on the option. Those are not trivial distinctions. We believe that the present case has more

in common with *Bak–A–Lum, supra,* and *Goodyear, supra,* than with *Brick Plaza, supra.*

■■■ Our review of the undisputed facts of this case leads us to the inescapable conclusion that defendant breached the covenant of good faith and fair dealing. Nineteen months in advance of the option deadline, plaintiff notified defendant in writing of its intent to exercise the option to purchase the ninety-nine-year lease. We will never know whether plaintiff's original attorney, Gabriel Spector, who died after a lengthy illness and who generated most of the correspondence, intended to close the deal and make the option payment before the deadline. However, we do know that plaintiff mistakenly believed that the purchase price was not due until the time of closing. As a result of plaintiff's failure to tender the purchase price, as required by the contract, execution of the option remained unperfected.

During a nineteen-month period, defendant, through its agents, engaged in a pattern of evasion, sidestepping every request by plaintiff to discuss the option and ignoring plaintiff's repeated written and verbal entreaties to move forward on closing the ninety-nine-year lease. Over the course of nineteen months, plaintiff's attorneys reached out to defendant and its representatives in repeated letters and telephone calls regarding exercising the lease option, all to no avail. Moreover, in support of defendant's application for a bank loan, plaintiff averred in an estoppel certificate that it had "exercised its option to convert lease to a fully prepaid 99 year lease . . . ." Defendant never challenged that formal declaration. After Spector's death, defendant's attorney continued to "play possum" despite the impending option deadline and obvious potential harm to plaintiff.

Defendant never requested the purchase price of the lease. Indeed, as defendant's attorney candidly admitted at oral argument, defendant did not want the purchase price because the successful exercise of the option was not in defendant's economic interest. Defendant preferred to watch the option die and did not break its silence until after the deadline had passed. In the first

complete response to plaintiff's many letters, defendant advised plaintiff that the option was off the table. Defendant, apparently, never intended to dispel plaintiff's misapprehension until plaintiff was fatally prejudiced.

Defendant submits that a landlord does not waive its right to demand strict compliance with the terms of an option in a lease agreement absent an affirmative misrepresentation. Defendant also insists that it did not engage in "delaying tactics" and that its "continued silence, in the face of repeated requests by plaintiff for affirmative action, could not reasonably have been construed as anything other than an implicit rejection." The record speaks otherwise.

■■ We are not eager to impose a set of morals on the marketplace. Ordinarily, we are content to let experienced commercial parties fend for themselves and do not seek to "introduce intolerable uncertainty into a carefully structured contractual relationship" by balancing equities. *Brick Plaza, supra,* 218 *N.J.Super.* at 105, 526 *A.*2d 1139. But as our good faith and fair dealing jurisprudence reveals, there are ethical norms that apply even to the harsh and sometimes cutthroat world of commercial transactions. Gamesmanship can be taken too far, as in this case. We do not expect a landlord or even an attorney to act as his brother's keeper in a commercial transaction. We do expect, however, that they will act in good faith and deal fairly with an opposing party. Plaintiff's repeated letters and telephone calls to defendant concerning the exercise of the option and the closing of the ninety-nine-year lease obliged defendant to respond, and to respond truthfully.

In concluding that defendant violated the covenant, we do not establish a new duty for commercial landlords to act as calendar clerks for their tenants. We do not propose that attorneys must keep watch over and protect their adversaries from the mishaps and missteps that occur routinely in the practice of law. The breach of the covenant of good faith and fair dealing in this case was not a landlord's failure to cure a tenant's lapse. Instead, the

breach was a demonstrable course of conduct, a series of evasions and delays, that lulled plaintiff into believing it had exercised the lease option properly. Defendant acted in total disregard of the harm caused to plaintiff, unjustly enriching itself with a windfall increase in rent at plaintiff's expense. In the circumstances of this case, defendant's conduct amounted to a clear breach of the implied covenant of good faith and fair dealing.

We are mindful of the potential pitfalls in enforcing the covenant of good faith and fair dealing. If courts construe the covenant too broadly, it "could become an all-embracing statement of the parties' obligations under contract law, imposing unintended obligations upon parties and destroying the mutual benefits created by legally binding agreements." *Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 *F.*3d 78, 92 (3d Cir.2000). We have warned that " 'an allegation of bad faith or unfair dealing should not be permitted to be advanced in the abstract and absent an improper motive.' " *Wade, supra*, 172 *N.J.* at 341, 798 *A.*2d 1251 (quoting *Wilson, supra*, 168 *N.J.* at 251, 773 *A.*2d 1121). " 'Contract law does not require parties to behave altruistically toward each other; it does not proceed on the philosophy that I am my brothers keeper.' " *Wilson, supra*, 168 *N.J.* at 251, 773 *A.*2d 1121 (quoting *Original Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.*, 970 *F.*2d 273, 280 (7th Cir.1992)). We stress that while a commercial party does not have to act with benevolence towards an opposing party, it cannot behave inequitably.[5]

### III.

In light of defendant's breach of the covenant of good faith and fair dealing, we hold that plaintiff is entitled to specific perform-

---

[5] Drawing on the "aspirational" Principles of Professionalism for Lawyers and Judges promulgated by the New Jersey Commission on Professionalism in the Law, plaintiff asks this Court to define a lawyer's general duty of candor in a real estate transaction. *See generally* N.J. Comm'n on Professionalism in the Law, *Principles of Professionalism for Lawyers and Judges* (1997), *available at* http://www.njsba.com/commission_on_prof/index.cfm?fuseaction=principles. Given our disposition of this case, we decline plaintiff's invitation to do so.

ance of the lease option in accordance with the terms of the contract. We reverse the Appellate Division and remand to the trial court for proceedings consistent with this opinion.

*For reversal and remandment*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI, ALBIN, WALLACE and RIVERA–SOTO—7.

*Opposed*—None.