

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-11-2009

# Farash & Robbins Inc v. Fleet Bank

Precedential or Non-Precedential: Non-Precedential

Docket No. 07-3411

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"Farash & Robbins Inc v. Fleet Bank" (2009). *2009 Decisions*. Paper 1386.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1386

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 07-3411
_____

FARASH & ROBBINS, INC.

v.

FLEET BANK, f/k/a SUMMIT BANK; SUMMIT BUSINESS CAPITAL CORP.;
FLEET CAPITAL CORPORATION;

v.

ISIDOR FARASH

Farash & Robbins, Inc.;
Isidor Farash,

Appellant
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 03-cv-361)
District Judge: Honorable Dennis M. Cavanaugh
_____

Submitted Under Third Circuit LAR 34.1(a)
February 6, 2009

Before:  McKEE, JORDAN, and LOURIE*, *Circuit Judges.*

(Filed:  May 11, 2009)

_____

        *Honorable Alan D. Lourie, Circuit Judge of the United States Court of Appeals
for the Federal Circuit, sitting by designation.

OPINION OF THE COURT

JORDAN, *Circuit Judge*.

Farash & Robbins, Inc. ("F&R") and Isidor Farash appeal the judgment of the United States District Court for the District of New Jersey against them and in favor of Fleet Capital Corp. ("Fleet") in the amount of $4,498,051.40 and $350,000.00, respectively.

F&R's Second Amended Complaint alleged five counts against Fleet: breach of contract, negligent misrepresentation, breach of the covenant of good faith and fair dealing, consumer fraud in violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann.§ 56:8-2 ("CFA"), and common law fraud.[1] Those claims all arose out of a loan agreement (the "Loan Agreement") between F&R and Summit Bank ("Summit"), Fleet's predecessor in interest.[2] Fleet filed counterclaims for breach of contract, conversion, and fraud, along with a third-party complaint against Farash, the owner of F&R, for breach of contract (as guarantor to the Loan Agreement), conversion, and fraud. The District Court

_____

[1] F&R's earlier complaints are not relevant to this appeal. For simplicity, we will refer to F&R's Second Amended Complaint as its "Complaint."

[2] The identity of the correct defendant in this case was a contested issue, in part because Summit and Fleet entities merged about a year after the parties here finalized the Loan Agreement. The District Court determined that the merger made Fleet successor in interest to the Loan Agreement and the proper defendant in the case, a holding that the parties do not dispute on appeal.

dismissed F&R's negligent misrepresentation, CFA, and common law fraud claims before

trial. Following a bench trial, the District Court ruled against F&R on its claims for

breach of contract and breach of the covenant of good faith and fair dealing, holding that

Fleet had not breached the Loan Agreement and had acted in good faith in its dealings

with F&R; the Court also ruled in favor of Fleet on its breach of contract claims.[3] *See*

*Farash & Robbins, Inc. v. Fleet Nat'l Bank ex rel. Summit Bank*, No. 03cv361, 2007 WL

1686702 (D.N.J. June 11, 2007).[4] For the following reasons, we will affirm the District

Court's judgment.

## I. Background

### A. The Parties' Relationship

Because we write primarily for the parties, we only describe those facts that are

necessary to our decision. Pursuant to the Loan Agreement, Summit agreed to provide

F&R a revolving line of credit with a maximum principal amount of, ultimately,

$1,500,000 for working capital.[5] In addition to the $1.5 million cap, the revolving line of

credit was limited to F&R's "Borrowing Base." The Loan Agreement defined F&R's

---

[3]The District Court's judgment states that it was "dismissing with prejudice all of F&R's claims against [Fleet]." The Court's opinion makes clear, however, that it decided F&R's breach of contract and breach of the covenant of good faith and fair dealing claims on the merits.

[4]The court also held that Fleet's conversion and fraud claims lacked merit. *Id*. at *6-8. Fleet did not appeal that determination.

[5]The Loan Agreement was amended twice. Only the final version is relevant to this appeal.

3

Borrowing Base as "(a) 80% of [F&R's] Eligible Accounts Receivable ... plus up to (b) 50% of the value of [F&R's] Eligible Inventory ... up to a maximum of $1,250,000.00 with respect to Eligible Inventory."[6] (App. at 759.) Farash personally guaranteed F&R's obligations under the Loan Agreement up to $350,000 (the "Limited Guarantee").

The Loan Agreement required F&R to submit to Summit (and later to Fleet) monthly Borrowing Base Certificates ("BBCs"), which were to include information relating to F&R's line of credit, such as its Borrowing Base. Summit, and later Fleet, provided blank BBC forms for F&R to complete, certify, and submit. These forms required F&R to note its negotiated Borrowing Base formula on designated lines.

If F&R were to default on the Loan Agreement, Fleet was authorized to increase the interest rate on F&R's loans by 5%. The Loan Agreement also required F&R and Farash to pay Fleet's attorneys' fees and costs following an F&R default. An F&R default was defined to include the nonpayment of any payment due.

Leading up to the merger between Fleet and Summit, Robert Wainwright, a loan officer from Fleet, assured Farash that the Loan Agreement would remain unchanged. In June of 2001, however, while reviewing F&R's financial documents in connection with a licensing opportunity, Farash allegedly discovered that the BBCs contained a mistake in the Inventory Sublimit of the Borrowing Base, listing it as $625,000 rather than the $1,250,000 allowed by the Loan Agreement.

---

[6]For simplicity, we will refer to the maximum available credit with respect to F&R's Eligible Inventory as the "Inventory Sublimit" or simply the "Sublimit."

One might expect that Farash would have brought the erroneous Inventory Sublimit to the bank's attention, but apparently he did not. To the contrary, he included a letter with the September 2001 BBC stating that F&R was overadvanced on its credit facility, though ready and able to pay it down. The only reason for the overadvance, however, was that the Inventory Sublimit was incorrectly listed as $625,000. Had the Inventory Sublimit been listed correctly, the BBC would have indicated that F&R had over $400,000 of credit still available.

In October 2001, Farash met with Wainwright and Wainwright's supervisor, Jeff Dvorin. At the meeting, Farash gave Wainwright a check for $100,000. Wainwright recorded that the check was a "paydown to maintain formula." He accepted the check even though the bank's internal report indicated that F&R had $419,909 available on its line of credit.

At the same meeting, Wainwright and Dvorin told Farash that F&R needed to begin submitting weekly, rather than monthly, BBCs. F&R alleged that the weekly BBC requirement reduced its cash availability, created an increased workload for F&R, and made it difficult for F&R to forecast its cash requirements. Adding to the company's difficulties, F&R alleged that Fleet was unwilling to change the Inventory Sublimit on the BBCs until May of 2002. By that time, however, F&R's outstanding loan balance had nearly reached the absolute limit of $1.5 million.

At the same time, the relationship between Wainwright and Farash had become strained. In August, Dvorin assigned George Beyjoun to the F&R account, to replace Wainwright. After an initial review, Beyjoun concluded that F&R's inventory reporting was "weak" because F&R "ha[d] no perpetual inventory and use[d] the [gross profit] margin to roll forward."[7] (App. at 1607 ¶ 112.) Beyjoun additionally noted that the "roll forward calculation [was] not being submitted" and that the "inventory makeup [was] weak due to large returns and watches to be refurbished." (*Id.*) Subsequent correspondence from Fleet to F&R indicated that F&R refused to allow Fleet to conduct an "examination of the collateral." (App. at 1608 ¶ 113.)

On October 21, 2002, Fleet demanded payment "in full of all obligations due and owing under the Loan Agreement" within sixty days. (App. at 1608 ¶ 115.) F&R filed this lawsuit shortly before the sixty days expired.

### B. Procedural Background

Following its pretrial dismissal of F&R's negligent misrepresentation, CFA, and common law fraud claims, the District Court conducted a 10-day bench trial on F&R's breach of contract claims and Fleet's counterclaims and third-party claims. At the conclusion of trial, the District Court issued its findings of fact and conclusions of law.

---

[7] By using "roll forward" reporting, F&R would use its historic gross profit margin to estimate the value of its inventory. In other words, for its Eligible Inventory, F&R would report to the bank the anticipated value of the inventory, as measured by what F&R charges for its products, after deducting its anticipated gross profit margin. Thus, any uncertainty in the variables, including the anticipated gross profit margin, would limit the accuracy of F&R's inventory calculation.

The Court prefaced its opinion by noting that it found Fleet's witnesses more credible than Farash. 2007 WL 1686702, at *1. The Court then found that "the Bank loaned Plaintiff 100% of that which it agreed to loan, $1.5 million, and any problems that arose with the formula for lending arose as a result of Plaintiff's own sloppy bookkeeping and its errors in submitting ... Borrowing Base Certificates ... which were necessary to secure monies under the loan agreement." *Id.* at *2. Specifically, the Court found that "on the BBCs submitted by Plaintiff to the Bank, Plaintiff's bookkeeper entered one-half [of the Inventory Sublimit,] thereby theoretically reducing the amount of the potential loan from $1.25 million to $625,000.00." *Id.* Furthermore, "Farash himself signed off on the BBCs on a regular basis giving him the opportunity to correct the mistake." *Id.*

The Court also found that Fleet "routinely sought weekly and sometimes daily reporting from its borrowers," *id.* at *3, that the "BBCs submitted by Plaintiff were inaccurate due to among other things the type of inventory analysis that Plaintiff conducted," *id.* at *5, and that Wainwright "believed the submissions of weekly BBCs would actually assist F&R by improving cash flow and reducing borrowing costs with accumulated interest." *Id.*

Based on those findings, the District Court held that Fleet did not breach the Loan Agreement. *Id.* at *5. According to the Court, Fleet was not obligated to correct F&R's mistake with respect to the Inventory Sublimit. The Court also held that the Loan Agreement expressly authorized Fleet, at its discretion, to request additional financial

7

information from F&R, including BBCs. Similarly, the Court held that Fleet did not breach the covenant of good faith and fair dealing because it had a contractual right to require additional financial reporting, and F&R adduced no evidence that Fleet had a bad motive or intention when it exercised that right. The Court also concluded that, even had F&R been able to substantiate its claims for breach of contract, F&R's claimed injuries were too speculative to warrant recovery.

As to Fleet's breach of contract claims, the Court said it was undisputed that Fleet loaned F&R $1.5 million, that F&R had failed to repay any of the outstanding balance since requested by Fleet in October of 2002, and that Farash guaranteed the loan up to $350,000. *Id.* at *6. Because Fleet acted reasonably and in good faith in exercising its contractual rights, the Court concluded that F&R breached the Loan Agreement and Farash breached the Limited Guarantee.

Both F&R and Farash timely appealed.

## II.    Discussion[8]

### A.    *Liability for Breach of Contract*

Appellants contend that the District Court's factual findings were contrary to the evidence. We disagree.[9] The evidence clearly reveals that any limit on F&R's line of

---

[8]The District Court had diversity jurisdiction pursuant to 28 U.S.C. § 1332. We have jurisdiction pursuant to 28 U.S.C. § 1291.

[9]We review a district court's factual findings for clear error, which exists when, giving all due deference to the opportunity of the judge in a bench trial to evaluate the credibility of witnesses and to weigh the evidence, we are left with a definite and firm conviction

credit beyond that which was provided in the Loan Agreement was placed there through Appellants' own doing. At trial, Farash admitted that it was F&R's bookkeepers, not Fleet, that included the erroneous Inventory Sublimit of $625,000, and that the same Sublimit continued to appear even after Farash discovered the mistake. He also admitted that F&R never received any oral or written notice from Fleet (or Summit) that the Inventory Sublimit was being reduced and admitted that his earlier sworn statements to the contrary were false. Moreover, the testimony of Fleet's witnesses and Fleet's internal documents reveal that Fleet maintained the Inventory Sublimit at $1,250,000, notwithstanding the erroneous BBCs, and Fleet never denied a loan request based on the Sublimit error. Appellants admit that Fleet's assertion that the Inventory Sublimit had never been reduced by Fleet is "technically accurate." (Reply Br. at 8.)

F&R tries to paint Farash's October 2001 meeting with Wainwright and Dvorin as an overbearing encounter, stating that the loan officers "demanded that F&R give them a check to cover the overadvance" and indicated that Fleet had imposed a reduced Inventory Sublimit on F&R. (Appellants Opening Br. at 14.) The record reveals a different picture. Farash brought the supposed overadvance to Fleet's attention in his October 11 letter and volunteered a payment. Wainwright's testimony at trial implied that F&R's payment, made at a meeting that Farash himself described as "cordial," (App. at

---

that a mistake has been committed. *Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 435 n.1 (3d Cir. 2000).

2479-80), was not out of the ordinary and would be no reason to trigger an internal investigation into whether F&R was actually overadvanced. Although Farash and Dvorin did discuss the Inventory Sublimit around the time of that meeting, the record just as clearly supports a conclusion that the discussion centered around whether the Sublimit was to be constrained by the inventory value, rather than whether the Sublimit had been improperly reduced to $625,000. Thus, the evidence supports the District Court's conclusion that the reduced Inventory Sublimit was due to F&R's mistakes, not Fleet's actions.

Appellants also make two legal arguments as to the District Court's interpretation of the Loan Agreement.[10] Appellants first argue that it was Fleet's responsibility to correct errors in the BBCs. That argument does not withstand scrutiny. No provision in the Loan Agreement places such an obligation on Fleet. To the contrary, the BBCs themselves required F&R to certify that the information provided was correct. Appellants argue that Fleet was obligated to inform F&R of any errors in the BBC because Fleet generally reviewed BBCs to ensure that they were prepared correctly. Appellants fail, however, to provide us with any basis for imposing a legal obligation on Fleet to conduct those evaluations or to reveal their results to F&R.

Second, Appellants argue that Fleet did not have the authority to require weekly, as opposed to monthly, BBCs from F&R. That argument is belied by the plain language of

---

[10]We review a district court's construction of contract terms *de novo*. *Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 53 n.2 (3d Cir. 2001).

the Loan Agreement, which authorizes Fleet to require "such additional financial information, data, and documents, in form reasonably satisfactory to the Bank, as may be requested from time to time by the Bank in its sole discretion."[11]  (App. at 712 § 6.16.) Even if, as Appellants contend, F&R vigorously negotiated for monthly reporting requirements at the outset, it cannot avoid the unambiguous language of the Loan Agreement allowing Fleet to alter those requirements later.

B.      *Liability for Breach of Covenant of Good Faith and Fair Dealing*

Under New Jersey law, F&R is required to show "bad motive or intention" as a part of its claim for breach of the covenant of good faith and fair dealing.  *Iliadis v. Wal-Mart Stores, Inc.*, 922 A.2d 710, 722 (N.J. 2007).  Appellants argue that there is sufficient evidence to support a conclusion that Fleet acted in bad faith because "it created a reasonable belief on the part of F&R that its loan availability had been reduced."  (Reply Br. at 10.)  But the District Court found that it was F&R's own errors that created that reasonable belief, not any representation made by Fleet.   As discussed above, that finding is supported by the record.

---

[11]There is no support for F&R's contention that the additional information clause should be interpreted "as applying to financial information of [sic] borrower, except for BBCs." (Appellants Opening Br. at 31.)  Contrary to Appellants' assertion, the doctrine of *ejusdem generis* does not assist them.  In fact, as Fleet notes, applying it here may be viewed as having the opposite effect: the term "additional financial information, data, and documents" should include BBCs because they are specifically listed earlier.  (Answering Br. at 37.)  The clear language of that clause also forecloses Appellants' argument that Fleet was not authorized to demand actual inventory counts.

11

Appellants argue that Fleet's silence as to the actual Inventory Sublimit was in bad faith. *See Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 864 A.2d 387, 397 (N.J. 2005) (holding that a commercial entity may claim a breach of the duty of good faith and fair dealing where another remains silent in the face of a known mistake "with the purpose of exploiting the terms of the contract without regard to the harm caused to plaintiff."). That argument fails. Even if we assume that Fleet's loan officers realized that the BBCs erroneously stated the Inventory Sublimit, there is no evidence that Fleet was exploiting the terms of the contract. To the contrary, F&R received virtually all the money that it was allowed under the Loan Agreement, and there is no evidence that Fleet ever denied F&R's request for funds based on the erroneous BBCs. Although F&R's interest rate ultimately increased, that was a direct result of F&R's subsequent default for nonpayment, not Fleet's silence.

Appellants also argue that the District Court should have inferred a bad motive based on the "complete absence of rationale for demanding weekly reports." (Reply Br. at 16.) Again, however, the District Court justifiably found that Fleet had a rationale, including a belief that weekly BBCs would assist F&R by improving its cash flow and reducing borrowing costs with accumulated interest. Moreover, Fleet routinely requested weekly BBCs from its other customers. To the extent that these findings were based on credibility determinations, we must give them deference. Further, the record supports another good-faith reason for Fleet's request: F&R's inventory turnover, which relied

heavily on the tourism industry, was adversely affected by the events of September 11, 2001.[12] The District Court's determination that Fleet acted in good faith is adequately supported by the record.[13]

C.    *F&R's Tort Claims*

We may affirm the District Court's pre-trial dismissal of F&R's tort claims on different grounds than those on which the District Court relied. *See Donahue v. Gavin*, 280 F.3d 371, 372 n.2 (3d Cir. 2002) ("An appellate court may affirm a result reached by the District Court on different reasons ... as long as the record supports the judgment." (citations omitted)). Because F&R failed to establish that Fleet acted outside of the terms of the Loan Agreement, it is unable to establish, as the stated premise for its tort claims, that Fleet falsely represented that it did not intend to change the terms of the parties' agreement. Thus, the District Court's dismissal of F&R's tort claims was appropriate.

D.    *Fleet's Breach of Contract Claims*

Appellants do not directly contest the District Court's ruling on Fleet's breach of contract claims in favor of Fleet. Had F&R succeeded on either of its breach of contract claims, that might have affected Fleet's right to recover for breach of contract. Appellants do not state their theory as to what that effect would be, however, and,

---

[12]As Wainwright and Dvorin both testified, Fleet was concerned that about 80 percent of F&R's business came from the cruise ship industry.

[13]Because we conclude that F&R failed to prove that Fleet breached the Loan Agreement, we need not address Appellants' arguments relating to damages.

because we have determined that the District Court correctly ruled against F&R on its breach of contract claims, we need not dwell on it any further. Suffice it to say that Appellants do not dispute the District Court's conclusions that Fleet loaned F&R $1.5 million, that the Loan Agreement sets the default interest rate and assesses F&R attorneys' fees and costs, that Farash is a guarantor of the loan up to $350,000, and that F&R has failed to repay any of the outstanding balance since October of 2002. Thus, we will affirm the District Court's judgment in favor of Fleet and against F&R for breach of the Loan Agreement in the amount of $4,498,051.40 and against Farash for breach of the Limited Guarantee in the amount of $350,000.00.

III. Conclusion

For the foregoing reasons, we will affirm the judgment.