

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-11-2006

# Elliott & Frantz Inc v. Ingersoll Rand

Precedential or Non-Precedential: Precedential

Docket No. 05-2403

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Elliott & Frantz Inc v. Ingersoll Rand" (2006). *2006 Decisions.* Paper 530.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/530

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 05-2403

———

ELLIOTT & FRANTZ, INC.,

Appellant

v.

INGERSOLL-RAND COMPANY

———

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 03-04746)
Honorable John P. Fullam, District Judge

———

Argued June 1, 2006

BEFORE: AMBRO, FUENTES, and GREENBERG, Circuit Judges

(Filed: August 11, 2006)

———

Kevin F. Berry
Thomas B. Fiddler (argued)
Cozen & O'Connor
1900 Market Street
Philadelphia, PA 19103

    Attorneys for Appellant

Karen P. Layng (argued)
Andrew M. Gardner
Chad A. Schiefelbein
Vedder, Price, Kaufman & Kammholz
222 North LaSalle Street, Suite 2600
Chicago, IL 60601

Peter J. Boyer
McCarter & English
Mellon Bank Center
1735 Market Street
Suite 700
Philadelphia, PA 19103

Attorneys for Appellee

———

OPINION OF THE COURT

———

GREENBERG, Circuit Judge.

## I.  INTRODUCTION

This matter comes on before the court on an appeal by plaintiff-appellant Elliott & Frantz, Inc. ("Elliott & Frantz") from orders of the district court entered April 1, 2005, and April 6, 2005, granting defendant-appellee Ingersoll-Rand Company ("Ingersoll-Rand") summary judgment on Elliott & Frantz's contract claims arising out of Ingersoll-Rand's termination of the parties' Distributor Selling Agreement.  For the reasons set forth below, we will affirm the orders in part and reverse in part and will remand the matter to the district court for further proceedings.

## II.  FACTUAL AND PROCEDURAL HISTORY

### 1.  The Parties and Their Agreement

Plaintiff Elliott & Frantz is an industrial construction equipment sales and service provider incorporated under the laws of Pennsylvania with its principal place of business in that state.  Defendant Ingersoll-Rand is a manufacturer and supplier of industrial construction equipment incorporated under the laws of New Jersey with its principal place of business in that state.  In August 1994, Elliott & Frantz and Ingersoll-Rand entered into a written Distributor Selling Agreement (the "Agreement") pursuant to which Elliott & Frantz would have non-exclusive rights to promote, sell and service Ingersoll-Rand equipment within a specific geographical area, referred

2

to as the "Area of Primary Sales Responsibility," consisting of various counties in eastern Pennsylvania and Delaware. Although the Agreement granted Elliott & Frantz the "non-exclusive" right to represent Ingersoll-Rand's products within the Area of Primary Sales Responsibility, Elliott & Frantz asserts that the parties treated the Agreement as granting it an exclusive right.

The Agreement imposed certain responsibilities on Ingersoll-Rand including, inter alia, the obligation to "provide sales assistance, engineering and application advice, reasonable quantities of advertising materials, campaigns and instruction in sales and service." App. at 54, ¶ 2.B. On the other hand, the Agreement required Elliott & Frantz, inter alia, to "use its best efforts to develop business, to promote the sale of and to sell Equipment covered by this Agreement within its Area of Primary Sales Responsibility and [to] furnish prompt, efficient, and courteous service." App. at 54, ¶ 3.B.

Most relevant for our purposes, the Agreement contained a termination provision, which read in pertinent part:

DURATION AND TERMINATION OF AGREEMENT

A. This Agreement, unless terminated as hereinafter provided, shall continue in full force and effect until terminated by either party, without cause, on sixty (60) days written notice to such effect given to the other party.

B. This agreement may be terminated by Ingersoll-Rand on thirty (30) days written notice to Distributor, should the Distributor fail to satisfy the sales objectives as prescribed by this Agreement.

App. at 56, ¶ 13.A-B. (emphasis added). The Agreement further provided that "[the] Agreement including its attachments contains the entire and only agreement between the parties respecting the sale to and the purchase by the Distributor of the Equipment referred to herein, and any representation, promise or condition not incorporated herein shall not be binding on either party." App. at 57, ¶ 14.B. Finally, the Agreement provided that all questions arising under it were to be governed by New Jersey law.

3

## 2. Termination of the Agreement

In July 2002, Ingersoll-Rand notified Elliot & Frantz of its dissatisfaction with what it stated was Elliott & Frantz's declining performance under the Agreement. On May 12, 2003, Ingersoll-Rand sent a letter to Elliott & Frantz terminating its distributorships in Pennsylvania and Delaware. In particular, the termination letter read:

> [P]ursuant to Section 13 of the Agreement, the Agreement and our business relationship with respect to the Pennsylvania counties covered by the Agreement will terminate sixty (60) days from your receipt of this letter. The Agreement and our business relationship with respect to Delaware will terminate one hundred eighty (180) days from receipt of this letter.

App. at 138. Ingersoll-Rand explained that it based its decision to terminate the Agreement on "the continued unacceptable performance of Elliott & Frantz and the significant decline in its overall sales and market share with respect to [Ingersoll-Rand] products in 2002," which led Ingersoll-Rand to conclude that its products were "not being adequately represented by Elliott & Frantz." App. at 138.

## 3. Procedural History

In response to the termination, Elliott & Frantz commenced this action in the Court of Common Pleas of Philadelphia County, Pennsylvania, alleging breach of contract and breach of the duty of good faith and fair dealing.[1] Elliott & Frantz alleged that Ingersoll-Rand breached the Agreement by terminating it without cause inasmuch as, according to Elliott & Frantz, the parties had "by conduct amended the [Agreement] to eliminate Ingersoll-Rand's ability to terminate without cause." App. at 707, 718-19. With regard to this purported contractual modification, Elliott & Frantz alleged that "Ingersoll-Rand's annual review of Elliott & Frantz, Inc.'s performance indicated by its nature that so long as Elliott & Frantz, Inc. performed satisfactorily, it would be permitted to continue to have the right to sell Ingersoll-Rand products, and would not be terminated without cause." App. at 707. Of course, in Elliott &

---

[1] Elliott & Frantz also alleged that Ingersoll-Rand had interfered with Elliott & Frantz's existing and prospective contractual relationships but later withdrew this claim.

4

Frantz's view it had performed satisfactorily. Elliott & Frantz also alleged that Ingersoll-Rand further breached the Agreement by failing to provide the service and support that the Agreement required. Finally, Elliott & Frantz claimed that Ingersoll-Rand breached its duty of good faith and fair dealing by, among other things, arbitrarily terminating the Agreement, fabricating a pretext to terminate "for cause," and failing to reveal its corporate strategy that called for termination of the Agreement.

Ingersoll-Rand removed the action to the district court on diversity of citizenship jurisdictional grounds on August 18, 2003, and thereafter filed an answer including affirmative defenses and a counterclaim.[2] During discovery, Elliott & Frantz inquired into the factual bases explaining Ingersoll-Rand's decision to terminate the Agreement, and Ingersoll-Rand represented that it based its decision on Elliott & Frantz's unacceptable performance and decline in sales and market share. Shortly before the scheduled trial date, Ingersoll-Rand filed a motion for summary judgment on Elliott & Frantz's claims for breach of contract and breach of the implied covenant of good faith and fair dealing, arguing principally that it had "an absolute right to terminate [the Agreement] . . . without cause." App. at 13, 19-20. Ingersoll-Rand further asserted that Elliott & Frantz failed to proffer facts to support an allegation it advanced that the parties assented to, and provided new and independent consideration for, the purported modification of the Agreement. Finally, Ingersoll-Rand argued that the undisputed material facts demonstrated that it fulfilled all of its obligations under the Agreement.

Elliott & Frantz opposed Ingersoll-Rand's motion for summary judgment. Notably Elliott & Frantz asserted that Ingersoll-Rand had waived its right to terminate the Agreement without cause by failing to raise that right as an affirmative defense in its pleadings or during discovery. On April 1, 2005, the district court conducted a hearing on Ingersoll-Rand's motion for summary judgment and, later that same day, granted the motion and ordered that judgment be entered in favor of Ingersoll-Rand on Elliott & Frantz's claims.

---

[2]Ingersoll-Rand asserted in its counterclaim that Elliott & Frantz was liable for breach of contract, alleging that it had failed to pay for certain parts it purchased under the Agreement. This counterclaim, however, was not at issue on Ingersoll-Rand's motion for summary judgment and remains pending in the district court. Consequently it is immaterial on this appeal.

In a subsequent Memorandum dated April 5, 2005, the district court set forth the reasons for granting Ingersoll-Rand's motion for summary judgment.[3]  In its Memorandum, the court explained that Ingersoll-Rand did not waive its right to advance the without cause termination provision by failing to reference it in the termination letter.  The district court rejected Elliott & Frantz's contract claim predicated on the assertion that Ingersoll-Rand wrongfully had terminated the Agreement without cause, as the court explained that any purported modification of the Agreement to eliminate the termination without cause provision failed for lack of consideration.  The court also rejected Elliott & Frantz's arguments based on New Jersey public policy aimed at preventing economic duress.  Finally, with regard to the claim for breach of the duty of good faith and fair dealing, the district court stated that "[t]he contract calls for reasonable support to be provided, and a reasonable jury could not conclude that defendant failed to meet that standard," inasmuch as Ingersoll-Rand did not completely withdraw its contractually obligated support.[4]  Thereafter, Elliott & Frantz filed a timely appeal.

_____

[3] We believe that the district court was accommodating the parties by announcing its result on April 1, 2005, before it filed its Memorandum, as the court had scheduled the case for trial on April 4, 2005.  See also infra n.4.  By announcing its result on the same day as the hearing, the court courteously made it possible for the parties and their attorneys to stop preparations for the trial and to reallocate the time that they must have set aside for the trial.

[4] Despite ordering the entry of judgment in favor of Ingersoll-Rand on Elliott & Frantz's claims in its order dated April 1, 2005, the district court issued a second order directing entry of judgment in favor of Ingersoll-Rand and against Elliott & Frantz dated April 6, 2005.  See supra n.3.  Elliott & Frantz then appealed on April 29, 2005.  Subsequently, on June 2, 2005, the district court issued an order severing for separate disposition Ingersoll-Rand's counterclaim and ordering that the court's April 1, 2005 and April 6, 2005 orders constituted a final judgment pursuant to Fed. R. Civ. P. 54(b).  Elliott & Frantz then filed an amended notice of appeal on June 3, 2005.  In the interval between filing its original notice of appeal on April 29, 2005, and its amended notice of appeal on June 3, 2005, Elliott & Frantz moved for a stay in this court of the proceedings on the appeal as it had sought clarification from the district court as to whether the April 1, 2005 and April 6, 2005 orders were final judgments and thus were appealable.  We now deny the motion for the stay as it is moot inasmuch as we plainly have

6

III.  JURISDICTION AND STANDARD OF REVIEW

The district court exercised removal diversity of citizenship jurisdiction over this matter pursuant to 28 U.S.C. §§ 1441 and 1332, and we have jurisdiction pursuant to 28 U.S.C. § 1291.  We exercise plenary review of the orders granting summary judgment.  See Dilworth v. Metro. Life Ins. Co., 418 F.3d 345, 349 (3d Cir. 2005); Haugh v. Allstate Ins. Co., 322 F.3d 227, 230 (3d Cir. 2003).  Thus, we will affirm those orders if our review reveals that "there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter or law."  Fed. R. Civ. P. 56(c).  As the moving party, Ingersoll-Rand bears the burden of proof, and we view the facts in the light most favorable to Elliott & Frantz, the party against whom summary judgment was sought and entered.  See Dilworth, 418 F.3d at 349; Haugh, 322 F.3d at 230.  The parties agree that New Jersey law governs, and we will decide the case on that basis principally relying on opinions of the Supreme Court of New Jersey by which we are bound with respect to questions of New Jersey law.  See United States v. Jefferson, 88 F.3d 240, 245 (3d Cir 1996).

IV.  DISCUSSION

Inasmuch as the district court granted summary judgment in favor of Ingersoll-Rand on Elliott & Frantz's claims for breach of contract and for breach of the duty of good faith and fair dealing, we will address each claim separately.

1.  Breach of Contract

a.  Waiver

Initially we agree with the district court's conclusion that Ingersoll-Rand did not waive its argument predicated on its right to terminate the Agreement "without cause."  To start with, Ingersoll-Rand did not contractually waive its right to terminate the Agreement without cause even though its termination letter did not state explicitly that the termination was "without cause."  After all, as the district court noted, the Agreement did not include a provision requiring a particular form of a notification of termination.  In any event, although

---

jurisdiction.

7

the termination letter did not cite precisely to Subsection 13.A of the Agreement, which pertained to termination without cause, Ingersoll-Rand did cite to Section 13 by stating that "pursuant to Section 13 of the Agreement" the Pennsylvania distributorship would "terminate sixty (60) days from receipt of [the] letter." App. at 685. This locution is significant because the 60-day notice provision was unique to the "without cause" termination provision in Section 13.A, and thus Ingersoll-Rand's reference to both "Section 13" and the 60-day notice requirement of Section 13.A undoubtedly informed Elliott & Frantz that Ingersoll-Rand was invoking and relying upon Section 13.A.[5]

It is also obvious that Ingersoll-Rand was terminating the Agreement pursuant to the "without cause" provision for the negative reason that the Agreement provided that Ingersoll-Rand could terminate it on 30 days notice if Elliott & Frantz did not meet the Agreement's sales objectives. Clearly inasmuch as Ingersoll-Rand said that it was terminating Elliott & Frantz because of the significant decline in its sales and market share with respect to Ingersoll-Rand's products, the 30-day termination provision was available to it, but Ingersoll-Rand did not mention the 30-day termination provision in its letter.

We also hold that Ingersoll-Rand did not waive its right to terminate the Agreement without cause by specifying the reason for its action in the termination letter. It seems obvious to us that even if a party does not need cause to terminate a contract, it would be quite surprising if it did so without what it believed was good cause inasmuch as businesses, ordinarily at least, do not make decisions for whimsical reasons. Thus, the real benefit to a party of having the right to terminate a contract without cause is that it need not demonstrate that it can justify the cause for its actions.

---

[5]We note that the termination letter provided 180 days notice for termination of the Delaware distributorship, but that the 180-day notice does not correspond to Section 13.A or any other provision of the Agreement. Counsel for Ingersoll-Rand explained at oral argument that Ingersoll-Rand provided the 180-day notice for terminating the parties' business relationship in Delaware in order to comply with notice requirements imposed by Delaware law. Although the parties have not directed our attention to the Delaware statute to which counsel referred, our research indicates that Delaware statutory law requires a 180-day notice for terminating a dealer's contract. Del. Code Ann. tit. 6, § 2721 (2005).

8

We also believe that it would be remarkable to hold that in order to preserve its rights to terminate a contract without cause, a party is obliged to withhold the actual reason for its action from the other party, particularly when, as here, it had had a lengthy relationship with that party. Thus, we hardly can conceive that Ingersoll-Rand could have preserved its right to terminate the Agreement without cause by writing to Elliott & Frantz that "we are terminating the Agreement without cause" but that it waived that right by indicating why it was terminating the Agreement. We cannot bring ourselves to believe that the Supreme Court of New Jersey which, as we shall explain, places much emphasis on good faith and fair dealing, would reach such a result. We hope that the obvious decline in civility in our society has not reached such a level.

In addition, the record does not support Elliott & Frantz's characterization of Ingersoll-Rand's pleadings as evidencing its election to forego its contractual right to terminate the Agreement without cause or that the pleadings otherwise indicated that it did not intend to hold Elliott & Frantz to the "without cause" termination provision. In its Answer to the complaint, Ingersoll-Rand repeatedly denied that it surrendered the right to terminate without cause:

Paragraph No. 21:

The [Agreement] provides that it can be terminated with cause or without cause.

Answer:

[Ingersoll-Rand] admits the allegation in this paragraph.

Paragraph No. 22:

Subsequent to entering into the [Agreement], the parties by conduct amended the contract to eliminate Ingersoll-Rand's ability to terminate without cause. . . .

. . . .

Answer:

9

> [Ingersoll-Rand] denies the allegations in this paragraph.
>
> Paragraph No. 37:
>
> Upon information and belief, Ingersoll-Rand decided to terminate the [Agreement] for 'cause' because of the conduct of the parties that eliminated the 'without cause' provision of the [Agreement] . . . .
>
> Answer:
>
> [Ingersoll-Rand] denies the allegations in this paragraph.

App. at 707-08, 712.  A person reading Ingersoll-Rand's answer does not need the abilities of a soothsayer to understand that Ingersoll-Rand intended to preserve and exercise its right to terminate the Agreement without cause.

Moreover, on the contractual waiver point, we cannot even conceive why Ingersoll-Rand would waive its rights to terminate the Agreement without cause at the time that it was terminating the Agreement.  The possibility that Elliott & Frantz might challenge the termination could not have escaped Ingersoll-Rand's consideration, and surely it would not have intended to waive a strong legal position with which to defend against potential litigation just at the time that it might be useful to have a defense based on that position.  In this regard, as we explained above, the advantage of having a "without cause" termination provision is that it relieves a party of the necessity of justifying its action even if it believes that it has acted for good cause.

Second, we reject Elliott & Frantz's argument regarding "procedural waiver" in which Elliott & Frantz urges us to treat the contractual right to terminate the Agreement without cause as an affirmative defense that Ingersoll-Rand waived by failing to plead in a timely manner.  Although failure to raise an affirmative defense by responsive pleading or by appropriate motion "generally results in the waiver of that defense," Charpentier v. Godsil, 937 F.2d 859, 863 (3d Cir. 1991), Ingersoll-Rand's assertion of its contractual right to terminate the Agreement without cause is not an affirmative defense. On this point we observe that it is not among the affirmative defenses

10

enumerated in Fed. R. Civ. P. 8(c), and is not recognized as a "matter constituting an avoidance or affirmative defense" under federal or New Jersey law.[6]  See id.; N.J. Ct. R. 4:5-4.  Rather, the right to terminate the Agreement without cause in this case is a general defense inasmuch as it negates Elliott & Frantz's prima facie case for breach of contract.  See, e.g., In re Rawson Food Serv., Inc., 846 F.2d 1343, 1349 (11th Cir. 1988) (noting that a general defense, unlike an affirmative defense, challenges whether the plaintiff has made out a prima facie case).  Accordingly, the district court correctly rejected Elliott & Frantz's arguments concerning waiver.

---

[6]"Matters treated as affirmative defenses under state law are generally treated the same way by federal courts in diversity cases." Charpentier, 937 F.2d at 863.  While we recognize that the affirmative defenses listed in N.J. Ct. R. 4:5-4 "were not intended to be an exhaustive listing," Aikens v. Schmidt, 747 A.2d 824, 827 (N.J. Super. Ct. App. Div. 2000), Elliott & Frantz does not cite any authority, nor can we find any, requiring that a party assert as an affirmative defense in New Jersey a claim that a contract by its express terms could be and was terminated without cause.  In any event, in view of Ingersoll-Rand's express denial that the Agreement had been modified to eliminate the without cause termination provision, we would be reaching a hyper-technical conclusion if we held that Ingersoll-Rand waived its defense that it had a right to terminate the Agreement without cause by not labeling as an affirmative defense its termination of the Agreement as being without cause.  Clearly such a result would not be consistent with Fed. R. Civ. P. 8(f), which provides that "[a]ll pleadings shall be construed at to do substantial justice."

We also point out, in considering Elliott & Frantz's arguments regarding affirmative defenses, that usually it is not likely that a general denial of a plaintiff's complaint would be understood as suggesting that the defendant is raising an affirmative defense specifically set forth in Fed. R. Civ. P. 8(c) or N.J. Ct. R. 4:5-4.  For example, in an automobile personal injury action a defendant's denial that he was guilty of negligence that was the proximate cause of the plaintiff's injuries would not suggest that the defendant intended to argue that the statute of limitations bars the action.  In such a case it is therefore appropriate that the defendant be required to plead the statute of limitations as an affirmative defense.  Here, however, Elliott & Frantz surely should have understood from Ingersoll-Rand's answer that it was relying for a defense on its right to terminate the Agreement without cause.

11

b. Termination Without Cause

In further support of its breach of contract claim, we reiterate that Elliott & Frantz alleged that Ingersoll-Rand violated the Agreement by terminating it without cause in contravention of an oral modification of the Agreement supposedly eliminating Ingersoll-Rand's right to do so. The district court rejected this argument, concluding that the purported modification was not supported by consideration because "continued performance under the existing contract . . . does not amount to fresh consideration." Elliott & Frantz submits that the district court erred in its analysis of the consideration issue and that it raised genuine issues of material fact concerning the purported modification. Elliot & Frantz further argues that New Jersey public policy prohibited Ingersoll-Rand from terminating the Agreement without cause in light of what it regarded was a gross disparity in the two corporations' bargaining power.

Under New Jersey law, parties to an existing contract, by mutual assent, may modify their contract, and "modification can be proved by an explicit agreement to modify, or . . . by the actions and conduct of the parties, so long as the intention to modify is mutual and clear." County of Morris v. Fauver, 707 A.2d 958, 967 (N.J. 1998).[7] "A proposed modification by one party to a contract must be accepted by the other to constitute mutual assent to modify," and, "[u]nilateral statements or actions made after an agreement has been reached or added to a completed agreement clearly do not serve to modify the original terms of a contract . . . ." Id. In addition, an agreement to modify must be based on new or additional consideration. Id.; see also Unalachtigo Band of the Nanticoke-Lenni Lenape Nation v. State, 867 A.2d 1222, 1230 (N.J. Super. Ct. App. Div. 2005).

Initially on the modification issue, the parties dispute whether there was new or additional consideration supporting the purported modification. Elliott & Frantz submits that the district court erred in

---

[7]Ingersoll-Rand, citing the above quoted language in Fauver, argued in its brief that a contractual modification "can only be shown by presenting clear evidence," Appellee's br. at 7, and it repeated this contention at the oral argument on this appeal. We do not read Fauver as erecting a more stringent burden of proof in cases of modification than otherwise might apply; however, we need not decide the issue inasmuch as we find the modification claim fails as a matter of law under any standard no matter how lenient.

12

concluding that its continued performance under the Agreement could not amount to consideration sufficient to support the purported modification. In particular, Elliott & Frantz argues that under New Jersey law, inasmuch as the parties modified the Agreement to eliminate Ingersoll-Rand's ability to terminate it without cause, Elliott & Frantz's continued performance, which it could have discontinued at any time without cause, constituted consideration.[8] See Woolley v. Hoffmann-La Roche, Inc., 491 A.2d 1257, 1266-67, modified on other grounds, 499 A.2d 515 (N.J. 1985); Nolan v. Control Data Corp., 579 A.2d 1252, 1257 (N.J. Super. Ct. App. Div. 1990) (following Woolley). But this contention faces a possible barrier as the Supreme Court of New Jersey seems not to have determined that the implied employment contract analysis of Woolley, in which consideration by performance is presumed, is applicable outside the employment context. Ultimately, though, we need not decide the absence of consideration question because we find that Elliott & Frantz's modification claim fails on other grounds.

Even when construing the record in the light most favorable to Elliott & Frantz and drawing all inferences in its favor, as we must, there are no facts to support a finding that the parties modified the Agreement to eliminate the without cause termination provision, and, absent such a modification the breach of contract claim predicated on the termination of the Agreement must fail. In support of its argument that the parties modified the Agreement to eliminate the "without cause" provision, Elliott & Frantz relies primarily on testimony by a former Ingersoll-Rand employee, Ronald Keating, to the end that Ingersoll-Rand representatives informed Elliott & Frantz, along with other distributors, that "as long as you remain above the national market share average, you don't have anything to worry about. If you fall below, you need to be concerned." App. at 435. Moreover, Elliott & Frantz points out that other representatives of Ingersoll-Rand said substantially the same thing. Of course, in deciding this appeal we assume that the Ingersoll-Rand employees made these statements.

But contrary to Elliott & Frantz's claim that such statements

---

[8]Elliott & Frantz contends that it always retained the right to terminate the Agreement without cause, and Ingersoll-Rand does not challenge that assertion as it contends that the parties never deleted the without cause termination provision from the Agreement. The without cause termination provision in the Agreement allowed either party to terminate the Agreement without cause.

13

implied a promise by Ingersoll-Rand that "[it] would <u>only terminate</u> their distributorship contracts <u>for cause</u>," Appellant's br. at 10 (emphases added), plainly such representations cannot amount to a modification eliminating Ingersoll-Rand's express right to terminate the Agreement without cause, and a trier of the fact could not draw a reasonable contrary inference. Moreover, to the extent that they related to the termination provision of the Agreement they plainly related to Subsection 13.B., which dealt with termination by reason of a distributor failing to satisfy sales objectives. The statements did nothing more than explain that Subsection.

In any event, at most, the representations were unilateral expressions of Ingersoll-Rand's likely intent with respect to termination of the Agreement and were explanations that if Elliott & Frantz failed to perform adequately Ingersoll-Rand might terminate the Agreement as Section 13.B contemplated. The expressions cannot possibly be regarded as a relinquishment by Ingersoll-Rand of its critical right to terminate the Agreement for any reason or for no reason at all, as provided in section 13.A of the Agreement. They never even touched on that right.

As an analytical matter, it is one thing to explain that a particular circumstance, such as decline in market share, could result in termination and quite another to agree to terminate <u>only</u> for that particular reason. It is significant that Elliott & Frantz does not point to evidence suggesting that the participants in the conversations at issue referred to the Agreement generally or its termination provisions in particular, or that Ingersoll-Rand represented that <u>only</u> a decline in market share would trigger termination. In short, Elliott & Frantz has not produced any evidence to show, or from which a trier of the fact reasonably and fairly could infer, that Ingersoll-Rand made an offer to relinquish its express right to terminate the Agreement without cause, let alone that it made an offer to modify the Agreement to the end that it could terminate the Agreement only by reason of Elliott & Frantz's having a declining market share.[9]

---

[9]We are mindful of, but need not decide, the related issue of Elliott & Frantz's acceptance of the purported modification. New Jersey courts require "an unqualified acceptance" to conclude the manifestation of mutual assent; and while acceptance may be implied through conduct, silence does not ordinarily manifest assent, particularly in cases where the parties' relationship and circumstances justify the offeror's expecting a reply. <u>Weichert Co. Realtors v. Ryan</u>, 608 A.2d 280, 284 (N.J. 1992).

In asserting its claim of modification, Elliott & Frantz's reliance on Woolley is misplaced. In Woolley, an employee brought a breach of contract claim against his employer claiming that certain express and implied promises in the employer's personnel manual created a contract under which the employee could not be fired at will, but rather only for cause, and then only after the employer followed procedures outlined in the manual. The New Jersey Supreme Court held in Woolley that "an implied promise contained in a personnel manual that an employee will be fired only for cause may be enforceable against an employer even when the employment is for an indefinite term and would otherwise be terminable at will." 491 A.2d at 1258 (emphases added).

But the personnel manual, the distribution of which was deemed to constitute an offer in Woolley, stands in stark contrast to Ingersoll-Rand's oral statements. First, the personnel manual was a lengthy written document distributed by the employer to a large class of employees with the intent "that all employees be advised of the benefits it confers." Id. at 1260. Second, the manual contained five full pages devoted to "termination," which set forth the purpose and policy of the termination section and, most notably, defined "the types

_____

To this end, we note that the record indicates the parties did modify the Agreement twice and in both instances did so by means of a writing signed by both parties. Of course, we recognize that it would be expected that Elliott & Frantz would have been happy to accept an offer by Ingersoll-Rand to delete its right to terminate the Agreement without cause if it had made such an offer.

Nevertheless, in view of the procedural posture of this case we do not draw an inference against Elliott & Frantz by reason of its failure to secure or at least, as far as we are aware, seek a written modification of the termination without cause provision by reason of there having been written modifications of the Agreement on the two occasions when the parties modified the Agreement. Yet we cannot help but note that it seems strange that if Elliott & Frantz really thought that its Agreement had been modified, as it now contends, that it did not seek to protect its rights by having the modification memorialized in writing. In this regard we are aware that each party's right to terminate the Agreement without cause was a provision of critical importance under the Agreement. How could it be anything less inasmuch as the provision permitted either party to terminate the Agreement and thus end Elliott & Frantz's distributorship?

15

of termination," which did not include termination without cause. Id. As a result, the court concluded that "the policy manual represents the most reliable statement of the terms of . . . employment." Id. at 1265. The same simply cannot be said for Ingersoll-Rand's employees' comments. Here the Agreement remained the most reliable statement of the terms of the parties' contractual relationship. Elliott & Frantz's assertion is thus simply inaccurate when it claims that Ingersoll-Rand "made the same types of promises . . . as the defendant employer . . . in Woolley." Appellant's br. at 30. On the contrary, Woolley is starkly different, and Ingersoll-Rand's employees' comments fall far short of the representations the personnel manual in Woolley contained.

Moreover, Elliott & Frantz's comparison to Woolley fails outside the employment context. During oral argument counsel for Elliott & Frantz pressed the assertion that Woolley involved the same type of promise as here, arguing that "the only difference factually was that [Woolley] was an employer-employee context." Transcript of Oral Argument at 11. In addition to counsel being incorrect about the factual similarities, he understated the legal effect of the one difference he concedes. The promise in Woolley was made in a context vastly different from that here, and this distinction is critical inasmuch as the New Jersey Supreme Court in Woolley made clear that the context in which the promise was made in that case was central to its holding that the personnel manual constituted an offer for modification. Thus, the court explained that "the context of the manual's preparation and distribution is, to us, the most persuasive proof that it would be almost inevitable for an employee to regard it as a binding agreement, legally enforceable, concerning the terms and conditions of his employment." 491 A.2d at 1265 (emphasis added).

To the best of our knowledge, the New Jersey Supreme Court has not applied its Woolley holding beyond the employment context and instead has followed that case only in cases involving personnel manuals. See, e.g., Wade v. Kessler Inst., 798 A.2d 1251, 1258-59 (N.J. 2002); Nicosia v. Wakefern Food Corp., 643 A.2d 554, 557-58 (N.J. 1994); Witkowski v. Thomas J. Lipton, Inc., 643 A.2d 546, 550-51 (N.J. 1994). In this regard we point out that the parties have not directed our attention to any case in which that court has applied Woolley in a context analogous to that here. Moreover, the New Jersey Supreme Court has limited its holding in Woolley even within the employment context. See Shebar v. Sanyo Bus. Sys. Corp., 544 A.2d 377, 383 (N.J. 1988) (explaining that Woolley pertained to

16

established company-wide termination policies and not individual oral promises related to employment). Elliott & Frantz does not supply us with any reason to extend Woolley beyond the contours the New Jersey Supreme Court delineated in that case and we decline to do so.

We also point out the startling implications of Elliott & Frantz's contention as it attempts to tie Ingersoll-Rand's right to terminate its dealership to a demonstration that Elliott & Frantz did not maintain its sales performance at a certain level. Thus, it necessarily follows in Elliott-Frantz's view that if it maintained its performance at that level Ingersoll-Rand could not terminate its distributorship. Such a contract construction necessarily would give it the right to maintain its distributorship for an indefinite period, thereby hobbling Ingersoll-Rand's ability to operate its business in the most desirable way as circumstances changed. As a federal court exercising diversity jurisdiction, we would be loath to apply state law to support such a claim. Rather, if New Jersey law is to go to where Elliott & Frantz wants it to go, the New Jersey legislature or Supreme Court should take it there. See Leo v. Kerr-McGee Chem. Corp., 37 F.3d 96, 101 (3d Cir. 1994).

We also affirm the district court's rejection of Elliott & Frantz's breach of contract claim insofar as Elliott & Frantz based it on public policy. The case on which Elliott & Frantz bases its public policy argument, Shell Oil Co. v. Marinello, 307 A.2d 598 (N.J. 1973), pertains to franchise practices, a type of relationship creating legal consequences not germane in this proceeding. In point of fact, in reaching its decision in Shell Oil, the New Jersey Supreme Court based its public policy analysis largely on the legislative concerns embodied in the New Jersey Franchise Practices Act, N.J. Stat. Ann. § 56:10-1 (West 2001), see 307 A.2d at 602, a statute which is not applicable in this case and does not apply to the parties' relationship. Our rejection of the public policy theory is consistent with the New Jersey Supreme Court's rejection of similar attempts to extend the holding of Shell Oil beyond the context of franchise agreements. Thus, in Bak-A-Lum Corp. v. Alcoa Bldg. Prods., 351 A.2d 349, 352 (N.J. 1976), the court held that an at-will distribution agreement was "in no sense comparable" to the franchise agreement that produced the holding of non-terminability in Shell Oil.

Furthermore, even if we were inclined to credit Elliott & Frantz's characterization of New Jersey public policy as establishing that "without cause" termination provisions are ineffective "where

17

there is grossly disproportionate bargaining power," Appellant's br. at 33, there is no foundation in the record on which we could anchor an acceptance of its conclusory allegation that there is grossly disproportionate bargaining power between the parties in this case. Plainly, from its own representations we are constrained to conclude that Elliott & Frantz is not a weak entity as it claims that since 1962 it "has earned a reputation for being a top-notch distributor of industrial and construction equipment," maintaining numerous offices throughout Pennsylvania, Maryland, and Delaware. App. at 367, 401-10. Moreover, Ingersoll-Rand was concerned with the possibility that Elliott & Frantz would distribute products competitive to those of Ingersoll-Rand. Thus, in assessing Elliott & Frantz's public policy argument, this is an excellent case for us to apply the principle that courts cannot write a better contract than the one the parties made for themselves. See Kotkin v. Aronson, 815 A.2d 962, 963 (N.J. 2003) (citing Kampf v. Franklin Life Ins. Co., 161 A.2d 717, 720 (N.J. 1960)).

We also point out that merely because Ingersoll-Rand is a far larger business than Elliott & Frantz, it did not necessarily have grossly disportionate bargaining power in their dealings. Certainly a court must measure parties' bargaining power in the context of the subject matter of the bargaining at hand. For example, an individual owning a property that a major corporation greatly needed might have more bargaining power than the corporation in negotiations regarding the sale of the property and could compel it to pay a price for the property far exceeding what, in another context, would be regarded as its market value.

In this case the material time concerning the bargaining power of the parties was in 1994 when they entered into the Agreement including the "without cause" termination provision. At that time, as we already have explained, Elliott & Frantz long had been a "top-notch distributor of industrial and construction equipment," and had numerous offices throughout Pennsylvania, Maryland, and Delaware. App. at 367, 401-410. Certainly Elliott & Frantz was operating in a major market geographic area, and it would have been useful to Ingersoll-Rand to be represented by a distributor as successful as Elliott & Frantz. In the circumstances, we do not understand how a court could conclude that, in negotiating its Agreement with Ingersoll-Rand, Elliott & Frantz was in the weaker position. Clearly Elliott & Frantz's position was markedly different from that of an individual seeking to obtain a franchise from a major corporation so that he or

18

she can go into business.  If Elliott & Frantz did not like the "without cause" termination provision, the time to reject it was when the parties negotiated the Agreement, and if Ingersoll-Rand had insisted on it being in the Agreement, Elliott & Frantz could have declined to be its distributor and continued on with its already successful business.

### c.  Failure to Provide Required Support

In addition to claiming that Ingersoll-Rand improperly terminated the Agreement without cause, Elliott & Frantz asserted in the district court that it failed to provide certain services and support required by the Agreement.  The district court addressed this claim solely in the context of the good faith and fair dealing claim and rejected it, concluding that "[t]he contract calls for reasonable support to be provided," and that a jury could not conclude that Ingersoll-Rand failed to meet this standard.

The district court did not elaborate on its determination that there were no genuine issues of material fact with respect to the level of support provided, nor did the court explain why it was appropriate for it on a motion for summary judgment rather than the trier of fact at a trial, to decide whether Ingersoll-Rand provided a "reasonable" amount of support.  Yet in Richie & Pat Bonvie Stables, Inc. v. Irving, 796 A.2d 899, 906 (N.J. Sup. Ct. App. Div. 2002), the court held that the reasonableness of a party's reliance on a representation was a jury question for which evidence of industry custom and usage may have relevance.  It seems to us that if reasonableness was a jury question in that context, it should be a question for the trier of the fact, whether the court at a bench trial or a jury, in the context here as there is a genuine dispute of facts regarding a similar question of reasonableness.

But there is a more fundamental problem with the district court's analysis on this issue.  In fact, the reason we will reverse the judgment insofar as it rejected Elliott & Frantz's service and support claim arises from the vagueness of the contractual language at issue.  The district court based its conclusion on the premise that the Agreement   required a "reasonable" amount of support, but the Agreement did not say that, as the provision on that point read:

> Ingersoll-Rand shall provide sales assistance,
> engineering and application advice, reasonable
> quantities of advertising materials, campaigns and

19

instruction in sales and service.

App. at 54, ¶ 2.B.  Contrary to the district court's suggestion that "the contract calls for reasonable support to be provided," the term "reasonable" does not appear with regard to the quantity or quality of support and services required generally and the parties used the term "reasonable" only once to refer specifically to "quantities of advertising materials."

Nevertheless, Elliott & Frantz, like the district court, treats the Agreement as calling for reasonable quantities of support and services, including sales assistance, engineering and application advice, and instructions in sales and service.  We recognize that a requirement that a party's performance under a contract be "reasonable" ordinarily would commend itself to a court.  Ingersoll-Rand, however, asserts that the Agreement "did not mandate a quantitative level of assistance," and consequently even minimal amounts of support would suffice.  See Appellee's br. at 26-27.  In this case, the parties' differing constructions of the provision underscore its vagueness.  There is notably absent from the provision any indication that the parties agreed on how, how much, or when Ingersoll-Rand would provide sales assistance, engineering and application advice, campaigns and instruction in sales and service or what level its performance would have to reach with respect to these matters to be "reasonable," if that is the proper measure of the required performance.  Nor is it clear what constitutes a  "reasonable quantity" of advertising materials.

As a result, the breach of contract claim based on this provision of the Agreement was particularly ill-suited for disposition on a motion for summary judgment.  Where a contract contains vague provisions, New Jersey courts will fill gaps or interpret missing terms in it so as to furnish sufficiently definite meaning to the contract so long as there is evidence that the parties intended to enter into a bargain.  Paley v. Barton Sav. & Loan Ass'n, 196 A.2d 682, 686 (N.J. Sup. Ct. App. Div. 1964); accord Driscoll Constr. Co. v. Dep't of Transp., 853 A.2d 270, 276 (N.J. Super. Ct. App. Div. 2004) ("[W]here there is uncertainty, ambiguity or the need for parol evidence in aid of interpretation, then the doubtful provision should be left to the jury."); Satellite Ent. Ctr., Inc. v. Keaton, 789 A.2d 662, 667 (N.J. Sup. Ct. App. Div. 2002).  In construing vague provisions, New Jersey courts "will imply a reasonable missing term or, if necessary, will receive evidence to provide a basis for such an

implication." Satellite Ent., 789 A.2d at 667. In particular, courts will look to, among other things, all the relevant circumstances surrounding the transaction, as well as evidence of the parties' course of dealing, usage and course of performance. See, e.g., Leitner v. Braen, 143 A.2d 256, 260-61 (N.J. Sup. Ct. App. Div. 1958) (holding that contract for "the usual sponsorship fees" was enforceable despite vagueness and that evidence of custom and usage "is always relevant to make definite words which would otherwise be vague and indefinite"); see also E. Allan Farnsworth, Contracts §§ 7.12, 7.13 at 461-76 (4th ed. 2004).

In sum, absent an understanding of just what obligations Ingersoll-Rand undertook or at least what would be a "reasonable" performance of its obligations, if that is the applicable standard, the district court should not have determined that Ingersoll-Rand adequately performed under the Agreement. Accordingly, we will reverse the grant of summary judgment in favor of Ingersoll-Rand on Elliott & Frantz's breach of contract claim insofar as it rests the claim on Ingersoll-Rand's alleged failure to provide support and services required under the Agreement.[10]

We make a final observation regarding the services and support provision of the Agreement. We are aware that contracts frequently have provisions similar to the service and support provision in the Agreement, and we further recognize that our opinion on this point might be taken as extending an open invitation to litigation when the parties to a contract become dissatisfied with each other's performance. We regret these possible implications of our opinion, but we see no escape from them because vague provisions, even if their use in a contract cannot be avoided, invite disputes. But we nevertheless reach our result, as applicable principles of New Jersey law by which we are bound when coupled with summary judgment standards require that we do so.

2. Breach of the Implied Covenant of Good Faith and Fair Dealing

---

[10]Unfortunately we can give no more specific guidance on the method that the district court should use to construe the provision at issue on the remand. Perhaps there are standards in the industry that would be a guide. See Richie & Pat Bonvie Stables, Inc., 796 A.2d at 906.

The district court also rejected Elliott & Frantz's claim for breach of the implied covenant of good faith and fair dealing, and Elliott & Frantz challenges that disposition. But our review of the record satisfies us that the court correctly granted summary judgment on this issue.

Under New Jersey law, "[e]very party to a contract . . . is bound by a duty of good faith and fair dealing in both the performance and enforcement of the contract." Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs., 864 A.2d 387, 395 (N.J. 2005); see also R.J. Gaydos Ins. Agency, Inc. v. Nat'l Consumer Ins. Co., 773 A.2d 1132, 1145 (N.J. 2001); Onderdonk v. Presbyterian Homes, 425 A.2d 1057, 1062 (N.J. 1981). The New Jersey legislature has adopted the Uniform Commercial Code definition of "good faith," defining the term as meaning "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." N.J. Stat. Ann. § 12A:2-103(1)(b) (West 2004); see also Brunswick Hills, 864 A.2d at 395. The implied duty of good faith and fair dealing requires that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the full fruits of the contract." R.J. Gaydos Ins. Agency, Inc., 773 A.2d at 1146.

The Supreme Court of New Jersey has adopted the Restatement of Contracts explanation that "good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with justified expectations of the other party." Id. (citing Restatement (Second) of Contracts § 205, cmt. a (1981)). A plaintiff may be entitled to relief in an action under the covenant if the defendant acts with ill motives and without any legitimate purpose to destroy the plaintiff's reasonable expectations. Wilson v. Amerada Hess Corp., 773 A.2d 1121, 1130 (N.J. 2001). However, "bad motive or intention is essential," and "an allegation of bad faith or unfair dealing should not be permitted to be advanced in the abstract and absent improper motive." Id. Thus, as we indicated in Northview Motors, Inc. v. Chrysler Motors Corp., 227 F.3d 78, 92 (3d Cir. 2000), in a point the Supreme Court of New Jersey has approved even though we decided the case under Pennsylvania law, see Brunswick Hills, 864 A.2d at 399, the covenant should not be construed "too broadly" as it "could become an all-embracing statement of the parties' obligations under contract law, imposing unintended obligations upon parties and destroying the mutual benefits created by legally binding agreements."

22

In this case, there are no facts to demonstrate, or from which to infer, bad motive or intention. Elliott & Frantz offers only conclusory allegations that Ingersoll-Rand had such motives based largely on the timing of the termination of the Agreement. However, the record suggests just the opposite inasmuch as Elliott & Frantz concedes that members of Ingersoll-Rand management disagreed over what was the best course for their company and engaged in protracted internal debate regarding corporate strategy and the costs and benefits of utilizing company-owned stores. As the Supreme Court of New Jersey explained in Wilson, a party does not breach the implied covenant of good faith and fair dealing merely because its decisions disadvantaged another party, and "contract law does not require parties to behave altruistically toward each other." 773 A.2d at 1130 (internal quotation marks and citation omitted). Absent bad motive or intention, decisions a contract expressly permits which happen to result in economic disadvantage to the other party are of no legal significance. Id. Accordingly, if we allowed Elliott & Frantz's breach of the implied covenant of good faith and fair dealing claim to proceed we would be disregarding the caveat in Wilson that such claims under New Jersey law "should not be permitted to be advanced in the abstract and absent improper motive." Wilson, 773 A.2d at 1130.

In addition, the case to which Elliott & Frantz likens this matter, Brunswick Hills, 864 A.2d 387, is distinguishable and does not support Elliott & Frantz's argument. The lessee-plaintiff in Brunswick Hills sought to exercise a lease option that allowed for a 99-year renewal, and notified the landlord-defendant of its intention to do so on numerous occasions but without realizing that it had failed to meet all requirements for valid exercise. Despite knowing of the plaintiff's stated intention to exercise the lease option, "defendant, through its agents, engaged in a pattern of evasion, sidestepping every request by plaintiff to discuss the option and ignoring plaintiff's repeated written and verbal entreaties to move forward on closing the ninety-nine year lease." Id. at 398. The Supreme Court of New Jersey explained that the defendant's receipt of plaintiff's repeated letters and telephone calls concerning the exercise of the option obliged the defendant to respond and to respond truthfully. Id. at 399. The breach of the implied covenant in Brunswick Hills was "a demonstrable course of conduct, a series of evasions and delays, that lulled plaintiff into believing it had exercised the lease option properly." Id.

23

This case presents a starkly different set of facts and claims: Elliott & Frantz does not claim Ingersoll-Rand similarly thwarted its attempt to exercise some contractual right, let alone that it did so with bad motive or intent. While Elliott & Frantz alleges that Ingersoll-Rand "fail[ed] to reveal . . . its corporate strategy" of terminating the Agreement and opting for company-owned stores, app. at 721, the record does not contain any facts from which to infer that Ingersoll-Rand in implementing its strategy engaged in gamesmanship similar to that that the Supreme Court condemned in Brunswick Hills.

A more instructive precedent to consider regarding Ingersoll-Rand's failure to reveal its corporate strategy, and one on which Elliott & Frantz relied before the district court, but abandoned on appeal, is Bak-A-Lum, 351 A.2d 349, a leading case in which the New Jersey Supreme Court considered a good faith and fair dealing claim arising from the termination of an at-will distributorship.[11]  In Bak-A-Lum, the plaintiff and the defendant entered into an exclusive distributorship agreement, but the defendant ultimately terminated the exclusivity provision by appointing four additional distributors. Even though the defendant planned to terminate the distributorship and establish other means of distributing its products, it encouraged the plaintiff to order a large quantity of the defendant's products for resale and to undertake major expansion of its warehousing facilities. The Supreme Court of New Jersey upheld the lower court's decision finding that the defendant breached the implied covenant of good faith and fair dealing in its contract with the plaintiff. 351 A.2d at 352. However, it was not the mere withholding of termination plans that gave rise to the breach; instead, the New Jersey Supreme Court explained that the defendant breached the covenant because it kept silent while simultaneously encouraging the plaintiff's substantial investment in merchandise and facilities expansion. Id.

In this case there are no facts demonstrating or implying that there was a comparable scenario. Even crediting Elliott & Frantz's allegation that Ingersoll-Rand "fail[ed] to reveal . . . its corporate strategy" that included termination of the Agreement, the situation here differs from that in Bak-A-Lum, as nothing in the record suggests that Ingersoll-Rand withheld its "corporate strategy" with knowledge Elliott & Frantz was making investments or otherwise relying to its detriment based on an assumption of Agreement's continuation, let

---

[11]Elliott & Frantz did not cite Bak-A-Lum in either its opening or reply brief in this court.

alone that Ingersoll-Rand induced it to expend resources while knowing its secret "corporate strategy" called for termination of the Agreement. Thus, Elliott & Frantz's abandonment of its reliance on Bak-A-Lum is telling. In sum, we cannot conclude that the record contains any facts from which to infer that Ingersoll-Rand breached the covenant of good faith and fair dealing.

## V. CONCLUSION

For the foregoing reasons we will affirm the orders of April 1, 2005, and April 6, 2005, except to the extent that they entered judgment for Ingersoll-Rand on Elliott & Frantz's claim that Ingersoll-Rand failed to provide certain services and support required by the parties' Agreement. To that extent we will reverse the orders of April 1, 2005, and April 6, 2005, and we will remand the case to the district court for further proceedings consistent with this opinion. The parties will bear their own costs on this appeal.

_____