NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 09-2885
_____

WESTMONT DEVELOPMENT GROUP,

Appellant

v.

TOWNSHIP OF HADDON, MAYOR RANDALL W. TEAGUE
COMMISSIONER JOHN C. FOLEY, COMMISSIONER PAUL DOUGHERTY
AND CAMDEN COUNTY IMPROVEMENT AUTHORITY,

_____

On Appeal from United States District Court
for the District of New Jersey
(D.C. No. 07-cv-05846)
District Judge: Honorable Joseph E. Irenas

_____

Submitted Under Third Circuit LAR 34.1(a)
February 5, 2010

Before:  McKEE, HARDIMAN, *Circuit Judges*, and DAVIS,* *District Judge*

(Filed: April 13 , 2010)

_____

* The Honorable Legrome D. Davis, District Judge for the United States District Court for the
Eastern District of Pennsylvania, sitting by designation.

_____

OPINION OF THE COURT
_____

DAVIS, *District Judge*

Plaintiff Westmont Development Group, LLC appeals the order of the District Court entering summary judgment in favor of Defendants Township of Haddon, Mayor Randall W. Teague, Commissioner John C. Foley, and Commissioner Paul Dougherty pursuant to Federal Rule of Civil Procedure 56. The District Court's order also entered judgment on Plaintiff's pleadings in favor of Defendant Camden County Improvement Authority pursuant to Federal Rule of Civil Procedure 12(c). We will affirm the District Court's decision in full.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This litigation arises from a failed contract. Westmont Development Group, LLC ("WDG"), a Pennsylvania limited liability company whose principal is Joanna Pang, and the Township of Haddon, a municipality in Camden County, New Jersey, entered into a Redevelopment Agreement on May 26, 2004 ("Agreement"), for the development of a live entertainment venue and other commercial uses at the Westmont Theater, located at 49 Haddon Avenue in Haddon, New Jersey. WDG did not comply with the Agreement and on December 13, 2007, the Township terminated the Agreement.

The Township of Haddon is governed by a Board of Commissioners, one of whom is designated as the Mayor. The Township also has a Planning Board, which is an independent governmental body from the Township. The Camden County Improvement Authority ("CCIA") is an entity created by the Camden County Board of Freeholders, which is authorized to assist municipalities with financing public projects.

2

The Westmont Theater redevelopment project began when the Township and the CCIA entered into a November 1, 1998 Lease-Purchase Agreement for the Westmont Theater property. Under that agreement, the Township transferred title to the Westmont Theater property to the CCIA and in return, the CCIA provided financing to the Township for improvements to the property. The CCIA funded the redevelopment project by issuing $700,000 in bonds. The CCIA leased the property back to the Township, giving the Township physical possession and control of the premises. Since 1998, the CCIA has held title to the Westmont Theater property.

In the May 26, 2004 Agreement between the Township and WDG, the parties agreed that any alteration, amendment, or modification was invalid unless memorialized in writing. They also agreed that failure of either party to insist upon strict performance of any term or obligation under the Agreement was not to be construed as a waiver or relinquishment of any terms or rights under the Agreement.

The Agreement, along with its attached Agreement of Sale, set the contractual parameters for an eventual conveyance of title to the Westmont Theater to WDG. That contemplated conveyance was contingent on consummation of the transaction in the Agreement. Also, WDG was required to obtain preliminary and final site plan approval from the Township before conveyance of title. Termination of the Agreement for any reason would nullify the Agreement of Sale.

The Agreement provided WDG with a sixty day due diligence period, commencing on May 26, 2004, during which period WDG could conduct any inspections or investigations it desired to determine whether it wished to go forward with the Agreement. If a condition was found that was unsatisfactory to WDG in its sole discretion, it was permitted to terminate the

3

Agreement. If WDG did not terminate the Agreement during the due diligence period, WDG was required to prepare and submit to the Township a proposed "Redevelopment Project Plan," as defined in the Agreement, by September 23, 2004. The Township Commissioners were required to review WDG's Project Plan within thirty days of receipt. The Commissioners were required to either approve the Project Plan, in which case WDG would proceed with the project, or advise WDG why the plan was inadequate and meet with WDG to resolve any differences.

WDG did not exercise its right to terminate the Agreement during the due diligence period that took place May 26, 2004, through July 25, 2004. Therefore, WDG was contractually required to prepare and submit to the Township a proposed Project Plan by September 23, 2004. WDG did not submit a Project Plan by that deadline or at any time thereafter.

WDG's failure to timely submit a Project Plan constituted a default under the Agreement. The Township explained the Plan's inadequacies, but did not place WDG in default. Instead, as the District Court correctly found, "a practice began that would persist throughout the term of the contract — time frames articulated therein were not adhered to, and the Township liberally granted WDG extensions of contractual deadlines. . . . Those extensions were not memorialized in writing." Slip op. at 9-10, June 15, 2009 (Irenas, J.).

Under the Agreement, WDG was required to first obtain the Township's approval of WDG's Project Plan and then obtain the Planning Board's preliminary site plan approval. Instead, in March 2005, WDG began the process of obtaining the Planning Board's approval of WDG's conceptual site plans for the Westmont Theater, without having first submitted a proposed Project Plan to the Township. Over the following months, WDG and its engineers, Bach Associates, P.C., submitted voluminous documents to the Planning Board, including a site

4

plan, a traffic impact study, and drainage calculations. There is no evidence WDG delivered any of these submissions to the Township for consideration by the Commissioners.

Pang appeared before the Planning Board on a number occasions, seeking approval for WDG's site plan. During Pang's appearance before the Board on July 7, 2005, the Board expressed concern with WDG's application primarily because it failed to adequately address parking for the Westmont Theater. WDG never submitted a revised application for site plan approval and never submitted a Project Plan to the Township for review and approval. There is no evidence the Planning Board ever reached a decision on the merits of WDG's site plan.

From the inception of the Agreement, both WDG and the Township were aware that WDG anticipated a volume of theater patrons that far exceeded the capacity of the theater property's existing parking lot. Both WDG and the Township were aware that finding a solution to WDG's parking needs posed a challenge. Pang acknowledged she knew parking was going to be an issue before she signed the Agreement. She also knew parking was the responsibility of WDG, not the Township, under the Agreement.

Pang and her counsel explored a number of possible, but unsuccessful solutions to WDG's parking needs. They focused their efforts on acquiring a neighboring vacant lot, known as the Russell Cast Stone property, to provide parking for the Westmont Theater. The Walters Group, through a related entity, Rose Hill Associates, LLC ("Rose Hill"), owned the Russell property. Rose Hill declined to sell or lease the property to WDG.

WDG anticipated that the Township would take the Russell property by eminent domain for public use, including WDG's use. The Township had completed a parking study, which indicated that the Russell property was the most logical source of additional parking for the

5

Township's downtown district. Township officials considered acquisition of the Russell property in late 2006 to early 2007. During this period, WDG was told that the Township would obtain the Russell property either by purchase or the exercise of eminent domain. Nonetheless, the Township never moved forward to acquire the Russell property.

While WDG struggled to find adequate parking in 2006, Township representatives suggested amending the Agreement to permit WDG to accomplish the redevelopment in phases. The phased plan presented no solutions for WDG's parking needs, however. As explained by Pang, the first phase would redevelop the property surrounding the theater, and the second phase would redevelop the Westmont Theater itself. Pang believed that there was adequate parking available on the Westmont Theater property to meet the needs of the first phase. WDG hoped that a solution to the parking needs of the Theater itself would be found before the second phase commenced. Pang believed the Russell property could be that solution.

A written amendment to the Agreement was prepared, circulated, commented upon, and revised in late 2006 or early 2007. WDG then understood that the Township's signature on the written amendment was forthcoming. Pang knew redevelopment of the Westmont Theater was a public project and understood no one elected official could bind the Township without getting formal approvals from the Township Commissioners. The Township, however, put the contemplated amendment on hold because new Commissioners were to be elected in the next municipal election cycle in May 2007. Pang admitted no written amendment to the Agreement was ever entered into and the proposed amendment was never executed.

On May 13, 2007, the Township elected a new municipal government. Mayor Randall W. Teague and Commissioners John C. Foley and Paul Dougherty were elected. When they took

6

office, the Agreement was the only enforceable contract between the Township and WDG.

In early 2007, Mayor Teague and Commissioner Dougherty met over lunch with representatives of the Walters Group to obtain background information on the Russell property, including the history of litigation between the Township and Rose Hill concerning the property. Mayor Teague wanted to find out what Rose Hill intended to do with the property. He learned Rose Hill wanted to develop the property for residential use.

At a meeting in July 2007, the new Township administration met with WDG. The meeting was attended by Joanna Pang and her father, Stephan Pang, who had invested in WDG, Mayor Teague, and former Mayor William J. Park, Jr. As described by Pang, the meeting focused on "updating [Mayor Teague] on where the project stood and how the project was not being . . . phased." (Pang Dep., 146:12-15, July 7, 2008.) After the meeting, Pang called Mayor Teague numerous times to follow-up, but he never responded. At that point, WDG was waiting to move forward with phased redevelopment, pending approval by the Township.

By letter of November 12, 2007, the Township notified WDG it was in default, stating that the Township was "frustrated with the lack of progress" and that "the deadlines set forth in the May 26, 2004 Redevelopment Agreement have all expired without an approved redevelopment concept being put into motion." (Letter, App. 1869a-1870a.) This letter placed WDG on formal notice it was in default of the Agreement "on the basis that [WDG] has failed to submit a Redevelopment Project Plan as defined in the Agreement." *Id.* Under the Agreement, WDG had thirty days to cure the default or the Township could terminate the Agreement. By letter dated December 6, 2007, WDG's counsel responded to the Township's notice of default, resubmitting WDG's earlier proposal to phase the redevelopment project. By letter dated

7

December 10, 2007, the Township responded, indicating that the phasing plan replicated WDG's prior submission, but failed to meet the Agreement's definition of a Project Plan. By letter dated December 13, 2007, the Township terminated the Agreement "for failure to . . . cure the default identified in the Township's letter of November 12, 2007." (Letter, App. 1891a.)

WDG sued, alleging breach of contract, breach of the duty of good faith and fair dealing, and negligent misrepresentation by the Township of Haddon, and its newly elected Mayor Teague and Commissioners Foley and Dougherty (the "Township Defendants"). WDG also sued CCIA as a "named party in interest as they are the record owner of the subject Westmont Theater," but WDG pled "[t]here are no affirmative claims against [CCIA]." (Am. Compl. ¶ 7, App. 88.)

The Township Defendants moved for summary judgment on all claims pled by WDG. After the close of discovery, CCIA moved to dismiss WDG's pleading under Federal Rule of Civil Procedure 12(c). At oral argument on both motions on June 9, 2009, when questioned by the District Court whether CCIA was "really in this case," WDG's counsel confirmed that WDG asserted no affirmative claims against CCIA and stated, "the only thing they have is they hold the record title to the property." (Doc. 75, Mot. Hr'g Tr. 3:14-4:04, June 9, 2009.) By its Order of June 15, 2009, the District Court granted both motions filed by Defendants, which disposed of WDG's claims in their entirety, and further ordered that the temporary restraints placed earlier on conveyance of the Westmont Theater property be dissolved.

## II. STANDARD AND SCOPE OF REVIEW

WDG appeals the District Court's June 15, 2009 Order, raising two issues that challenge the District Court's entry of summary judgment on WDG's claims against the Township

8

Defendants for: (1) breach of contract and (2) breach of the duty of good faith and fair dealing.[1]

The District Court had jurisdiction pursuant to 28 U.S.C. § 1332 and we have jurisdiction pursuant to 28 U.S.C. § 1291.

We review *de novo* a district court's decision granting a motion for summary judgment pursuant to Rule 56, applying the same standard as that used by the District Court. *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 580-81 (3d Cir. 2009). A motion for summary judgment will not be defeated by "the mere existence" of some disputed facts, but will be denied when there is a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In determining whether the dispute is genuine, the court's function is not to weigh the evidence or determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 248-49.

## III. DISCUSSION

### A. Breach of Contract

In granting summary judgment, the District Court found that no reasonable jury relying on the evidence could conclude that the Township Defendants breached the Agreement as

---

[1] We decline to reach the District Court's dismissal of WDG's case against CCIA, or any issues or claims other than those set forth in WDG's statement of issues, because WDG has not preserved them on appeal. Federal Rule of Appellate Procedure 28(a)(3), (5), and (9) and Third Circuit Local Appellate Rule 28.1(a) required WDG to set forth "'all issues presented for appeal, together with supporting arguments and citations.'" *Kost v. Kozakiewicz*, 1 F.3d 176, 182 (3d Cir. 1993) (quoting *Simmons v. City of Philadelphia*, 947 F.2d 1042, 1065 (3d Cir. 1991)). WDG did not set forth any other issues or claims in its statement of issues or in the remainder of its brief on appeal, and therefore, we need not consider any other issues. *See Inst. for Scientific Info., Inc. v. Gordon & Breach, Sci. Publ'ers, Inc.*, 931 F.2d 1002, 1011 (3d Cir. 1991) (holding plaintiff abandoned its breach of contract claim on appeal).

9

advanced by WDG. In the District Court, WDG contended the Township Defendants breached Sections 6(g), "Purchase of the Westmont Theater Project," 7(b), "Eminent Domain," and 7(c), "Cooperation," of the Agreement. The District Court treated WDG's express allegation that Section 6(g) was breached as incorporating an allegation that Section 2 was breached because both Sections 2 and 6(g) of the Agreement pertained to conveyance of the Westmont Theater property to WDG. WDG advanced no other breach of contract claims. The District Court found no reasonable jury could conclude that WDG complied with preconditions to the operation of Sections 2, 6(g), 7(b) and 7(c) of the Agreement, and therefore Defendants' obligations to perform under those provisions never arose.

On appeal, WDG argues the District Court erred in concluding WDG was in default of the Agreement for failure to submit a Project Plan, and the Township Defendants did not breach the Agreement. WDG contends that the District Court ignored and disregarded evidence in so ruling. WDG is mistaken. The record WDG presents on appeal was fully reviewed and considered by the District Judge, who correctly concluded that evidence raised no genuine issues of disputed material fact. The District Court did not impermissibly weigh evidence and make credibility determinations as charged by WDG. Rather, the District Court properly disregarded the irrelevant deposition testimony and evidence on which WDG largely bases its appeal. Also without merit and lacking any support in the record are allegations of "subterfuge and conspiracy" among the Township Defendants, which purportedly precluded WDG from concluding the Agreement and proving its breach of contract claims.

The District Court did not err in concluding there were no genuinely disputed issues of material fact as to whether the Township Defendants breached any provision of the Agreement.

10

Where the terms of a contract are clear and unambiguous, courts enforce those terms as written. *Levison v. Weintraub*, 521 A.3d 909, 910 (N.J. Super. Ct. App. Div.), *certif. denied*, 527 A.2d 470 (N.J. 1987) (citing *Kampf v. Franklin Life Ins. Co.*, 161 A.2d 717, 720 (N.J. 1960) (ruling that "it is the function of a court to enforce [a contract] as written and not to make a better contract for either of the parties."). The undisputed facts show WDG never complied with the Agreement's requirement to submit a "Redevelopment Project Plan," as defined in the Agreement, for the Township's review and approval within four months of the effective date of the Agreement, by September 23, 2004. The Township and WDG never concluded an enforceable amendment to the Agreement, which could not be more clear: "No alteration, amendment or modification hereof shall be valid unless executed by an instrument in writing by the Parties hereto." (Agreement § 16(b), "Amendment; Waiver," App. 1296a.) It is undisputed no written amendment was ever executed.

On appeal, WDG claims the Township Defendants breached the Agreement by not conveying the Westmont Theater property to WDG. The Township was under no obligation to convey the property to WDG. Section 2 of the Agreement provided that "the Westmont Theater Property shall be sold to [WDG] under the terms of the Agreement of Sale . . . ." (App. 1274a.) Under Section 6(g) of the Agreement, and Sections 6(b) and (c) of the Agreement of Sale, the Township's obligation to convey the property was contingent on the consummation of the transaction in the Agreement and WDG's receipt of all permits and approvals from the Township. Because WDG never submitted a Redevelopment Project Plan, WDG never obtained any permits or approvals from the Township, and the Township's obligation to convey the Westmont Theater property never arose. As a result, the Township Defendants did not breach

11

Sections 2 and 6(g) of the Agreement.

WDG also claims the Township breached the Agreement by not taking the Russell property by eminent domain for WDG's use. The Township had no obligation to acquire the Russell property for WDG, either by eminent domain or purchase. Section 7(b) of the Agreement provided that the "Township shall acquire any privately-owned lots identified in the Redevelopment Project Plan for which [WDG] has not entered into agreement of sale as of the expiration of the Negotiation Period, as set forth in Section 6.c., above . . . ." (App. 1283a.) The "Negotiation Period" would have begun once the Township approved WDG's Project Plan. WDG, however, never submitted a Project Plan and the Negotiation Period never commenced or expired. Moreover, Section 7(b) obligated the Township to acquire only those "privately-owned lots identified in the Redevelopment Project Plan." (*Id.*) The Russell property was not identified in the Agreement as a property for inclusion in the Project Plan. For these reasons, the Township had no contractual obligation to acquire the Russell property by eminent domain and did not breach Section 7(b).

Finally, WDG contends the Township Defendants breached Section 7(c) of the Agreement, entitled "Cooperation," which expressly required the parties to act in accordance with the covenant of good faith and fair dealing. The District Court did not err in concluding the Township Defendants did not breach Section 7(c) of the Agreement for the same reasons they did not breach the implied covenant of good faith and fair dealing, as discussed below.

### B. Breach of the Duty of Good Faith and Fair Dealing

In granting summary judgment, the District Court found there was no basis from which a reasonable jury could find that the Township Defendants breached the covenant of good faith and

12

fair dealing as advanced by WDG. All contracting parties in New Jersey are required to act in good faith and deal fairly, whether the covenant is express or implied. *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 864 A.2d 387, 395 (N.J. 2005); *Sons of Thunder, Inc. v. Borden, Inc.*, 690 A.2d 575, 587 (N.J. 1997) (noting longstanding rule that "[e]very contract in New Jersey contains an implied covenant of good faith and fair dealing"). Before the District Court, WDG challenged the conduct of Mayor Teague and various representatives of his administration. The District Court did not err in concluding that even if WDG proved at trial that those actions occurred, no reasonable jury could find that the motives and conduct of the Township Defendants constituted a breach of the covenant of good faith and fair dealing.

On appeal, WDG complains that the District Court focused on terms of the Agreement, ignoring the Township Defendants' purported bad faith and lack of fair dealing. WDG contends that the Township acted in bad faith by notifying WDG it was in default and terminating the Agreement. The Township's exercise of its contractual rights to default WDG and terminate the Agreement alone cannot constitute bad faith conduct. WDG cannot employ the implied covenant of good faith and fair dealing to override the express terms of the Agreement. *Wilson v. Amerada Hess Corp.*, 773 A.2d 1121, 1126 (N.J. 2001). Rather, WDG must come forward with some evidence that when the Township Defendants notified WDG it was in default and terminated the Agreement, they acted with a bad faith motive to deprive WDG of anticipated benefits of the contemplated theater redevelopment project. There is no such evidence.

WDG complains it was not given an opportunity to work with Mayor Teague's new administration before the Township terminated the Agreement. WDG was in default of the Agreement for more than two years before Mayor Teague's administration took office. The prior

13

administration chose to ignore that default. The Agreement, however, was clear and unambiguous that either party's lack of insistence on strict performance did not constitute a waiver. *See Kampf*, 161 A.2d at 720 (noting "simple contract law" that "[w]hen the terms of [a] contract are clear, it is the function of a court to enforce it as written and not to make a better contract for either of the parties"). The Teague administration had no express or implied contractual obligation to continue the political and social policies of the previous administration. Moreover, the Teague administration had no express or implied contractual obligation to amend the Agreement to suit WDG.

Just as WDG argued before the District Court, WDG argues on appeal that the District Court ignored testimony and other evidence showing that the Township Defendants improperly favored the interests of the Walters Group and Rose Hill in their plans to develop the Russell property for residential use. For example, WDG complains the District Court ignored a "secret back-door meeting" among representatives of the Teague administration and the Walters Group to discuss the Russell property over lunch at the Tavistock Country Club, without inviting Pang or any other representative of WDG. (Appellant's Br. at 33-34.) WDG argues Mayor Teague was motivated to terminate the Agreement because his administration was promoting the Walters Group. WDG presents some circumstantial evidence that the Teague administration favored the interests of Rose Hill over the interests of WDG. Nonetheless, there is no evidence the Teague administration had an improper motive for doing so. Mayor Teague was elected to serve the interests of his constituents as he best determined those interests to be. Moreover, WDG was not entitled to favorable consideration because it never had any enforceable rights to acquire or use the Russell property.

14

WDG also argues that the District Court ignored testimony and other evidence showing that the Township Defendants compromised WDG's expectations and rights to receive benefits under the Agreement. There is no evidence the Township Defendants engaged in any conduct that frustrated or denied WDG its contemplated benefits under the Agreement. Moreover, WDG could have cured its default under the Agreement within thirty days of the Township's November 12, 2007 notice of default. WDG failed to cure its own default.

## IV. CONCLUSION

For the foregoing reasons, we will affirm the District Court's judgment in all respects.